[L. A. No. 25657. In Bank. Feb. 26, 1960.]

JOHN HUNLEY ABBOTT, Appellant, v. CITY OF LOS
ANGELES et al., Respondents.

A. L. Wirin, Fred Okrand, Norman G. Rudman and Edmund D. Edelman for Appellant.

Roger Arnebergh, City Attorney, Philip E. Grey, Assistant City Attorney, and William E. Doran, Deputy City Attorney, for Respondents.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, Jack K. Weber, Deputy Attorney General, Archie L. Walters, City Attorney (Burbank), Samuel Gorlick, Assistant City Attorney, Henry McClernan, City Attorney (Glendale), Walhfred Jacobson, City Attorney (Long Beach), Joseph B. Lamb, Assistant City Attorney, Allen Grimes, City Attorney (Modesto), Rodney R. Atchison, City Attorney (Mountain View), Robert O. Curran, City Attorney (National City), Wendell R. Thompson, City Attorney (Pasadena), Robert J. Costello, City Attorney (Redwood City), Everett M. Glenn, City Attorney (Sacramento), Ralph H. Prince, City Attorney (San Bernardino), Stanley T. Tomlinson, City Attorney (Santa Barbara), Ardy V. Barton, Assistant City Attorney, and Robert G. Cockins, City Attorney (Santa Monica), as Amici Curiae on behalf of Respondents.

PETERS, J.—Plaintiff brought this action for declaratory relief, and for an injunction, naming the city of Los Angeles, its police chief and its city attorney as defendants. He alleged the enactment of sections 52.38-52.53, inclusive, of the Los Angeles Municipal Code, which constitute a "criminal registration act."[1] He further alleged that he is a person

---

[1]The complaint sets forth the statute *in haec verba*. For our purposes herein, the following summarization will suffice:

Section 52.38 defines a "Convicted person" as anyone convicted in California of a felony, anyone convicted elsewhere of an offense punishable in California as a felony, anyone convicted in California or elsewhere of various listed offenses (including offenses involving narcotics, concealed or deadly weapons, silencers, flash-hiders, tear gas, etc.) regardless of whether such offenses are felonies or misdemeanors, anyone convicted in California or elsewhere of certain listed sex offenses (including some which under the California Penal Code are misdemeanors, some which may be either misdemeanors or felonies, and some which have

who has been convicted of a crime in that, having been classified as a conscientious objector under the federal Selective Training and Service Act of 1940, he was, in 1943 convicted (on a plea of guilty) of failure to remain in a civilian public service camp (violation of 50 U.S.C. App. 311), and was sentenced to two years in prison, which sentence he served (less time off for good behavior). He further alleged his knowledge of the provisions of the registration statute, together with his failure to register. He then challenges the ordinance as being unconstitutional, and alleges that he would suffer irreparable injury, by way of trial and punishment, if defendants are not restrained from enforcing its provisions. He

been omitted from Penal Code, section 290, which requires registration of certain sex offenders), anyone convicted in California or elsewhere of vagrancy as defined by subdivision 5 of Penal Code, section 647, and anyone convicted in California or elsewhere of either conspiracy or attempt to commit any of the enumerated offenses. The section further provides that certain (but not all) of the persons so defined shall continue to be considered as convicted persons, even though their convictions shall have been set aside ''in a manner provided by law'' after termination of probation.

Section 52.39 provides that it shall be unlawful for any such convicted person to be or remain in the city of Los Angeles for a period of five days, or to enter the city on five occasions during any 30-day period, without first registering with the chief of police, giving to the latter a written and signed statement setting forth in great detail certain required information regarding himself, his convictions (including conviction for offenses not enumerated in the preceding section), name and location of every penal institution in which he was ever confined (including reformatories), various places at which he may be located, information as to his intentions regarding future activities, together with such ''other and further information as may be required by the Chief of Police.'' The section also provides that persons convicted of the sex offenses listed in the previous section shall be required to reregister, even though previously registered.

Section 52.40 requires reregistration (of both residents and nonresidents of the city) and the repetition of the signed statement referred to in section 52.39, each time a convicted person changes his ''residence, stopping place, or living quarters.''

Section 52.41 provides for photography and finger printing with each such registration.

Section 52.42, although it first purports to make the records confidential, authorizes their transmittal to other law enforcement agencies, and also requires the chief of police to arrange for the exchange of all such information with other law enforcement agencies, without limitation. In the case of certain defined vagrants, dissemination of the information received from the registeree is authorized under circumstances relating to section 41.11 of the same code (which section was not produced herein).

Section 52.43 makes it unlawful for any registeree to give any false or misleading information, and also provides that the duty to register is a continuing one, and that each day of failure to comply constitutes a separate offense.

urges that the ordinance violates the due process clauses, the privileges and immunities clauses and the equal protection clauses of the Fourteenth Amendment to the United States Constitution, and also violates sections 4, 11, 13 and 21 of article I, and section 25(33) of article IV of the California Constitution.

Defendants in their answer, admit every allegation of the complaint save and except the allegations of unconstitutionality and the allegations that plaintiff has no plain, speedy or adequate remedy. Specifically admitted are the allegations regarding the dispute between the parties, thus eliminating all questions of the propriety of the causes of action for declaratory relief. Injunctive relief is also proper.[2] With the pleadings so framed, the only issue before the trial court was the constitutionality of the ordinance.

A *pro forma* trial was had, during which the admitted facts were placed in evidence by the unrebutted testimony of plaintiff, who also testified that his occupation as a carpenter required him alternately to leave Los Angeles and to return thereto for varying periods of time, and to change his residence at frequent intervals. The trial court made its findings of fact in conformity with this testimony, and concluded that the ordinance is constitutional, both on its face and as applied to plaintiff. Judgment was entered thereon in favor of defendants. Plaintiff has appealed.

Although the Legislature of this state has enacted numerous laws requiring individuals and organizations to register name,

[2]Neither of the parties at any time during these proceedings has raised any question regarding the use of injunction or declaratory relief as a proper method of determining the constitutionality of the challenged ordinance. Either remedy is available for the purpose. When the enforcement of a law or ordinance would injure plaintiff's rights, equity may enjoin the prosecution (see cases collected 27 Cal.Jur.2d, § 26, p. 133; see also *Porterfield* v. *Webb*, 195 Cal. 71, 74 [231 P. 554]). Declaratory relief has also been used in California to challenge the constitutionality of penal statutes and ordinances (*Portnoy* v. *Superior Court*, 20 Cal.2d 375, 378 [125 P.2d 487]; *LaFranchi* v. *City of Santa Rosa*, 8 Cal.2d 331 [65 P.2d 1301, 110 A.L.R. 639]; *Sandelin* v. *Collins*, 1 Cal. 2d 147 [33 P.2d 1009, 93 A.L.R. 956]. See also the following cases holding that declaratory relief is a proper vehicle for testing the validity of statutes of a nonpenal nature: *Salsbery* v. *Ritter*, 48 Cal.2d 1, 7 [306 P.2d 897]; *Bess* v. *Park*, 132 Cal.App.2d 49 [281 P.2d 556]; *Mefford* v. *City of Tulare*, 102 Cal.App.2d 919 [228 P.2d 847]; *Monahan* v. *Department of Water & Power*, 48 Cal.App.2d 746, 751 [120 P.2d 730]; *Andrews* v. *City of Piedmont*, 100 Cal.App. 700 [281 P. 78]). The theory of these cases was perhaps best expressed by Borchard in his book on Declaratory Judgments (1934) where he pointed out (p. 278) that to exclude examination of penal statutes from the operation of declaratory relief is like ''telling the prospective victim that the only way to determine whether the suspect is a mushroom or a toadstool is to eat it.''

address and activity,[3] there appears to be but one such statute requiring registration with either state or local authority by reason of previous conviction of crime. That is Penal Code, section 290, which requires that persons who have been convicted of certain specified sex crimes must register with the sheriff or chief of police in the area in which they reside. On the other hand, some municipalities within California have enacted so-called criminal registration ordinances applying to many offenses.[4] The present case appears to be the first to come before this court involving the constitutionality of such a "criminal registration" ordinance.[5]

[3]Most of such statutes comprise professional licensing procedures, such as the State Bar Act, State Medical Practice Act, and similar acts covering the licensing and regulation of accountants, barbers, dentists, optometrists, pharmacists, social workers, teachers, etc. Others cover similar licensing and regulation of nonprofessional persons whose activities are deemed to require regulation, such as contractors, dry cleaners and pawn brokers. Still other statutes requiring registration have been enacted to regulate fields of endeavor in which the public interest obviously requires some resort to the police power, and include auto courts, boxing and wrestling, charities, child employment, lobbyists, sanitariums, subversive organizations, and dealing in narcotics. These comprise only a portion of the individuals and organizations which by statute are required to register before voluntarily engaging in a specified activity. However, no state statute has been found, other than Penal Code, section 290, which requires registration solely by reason of a disability suffered in the past.

[4]A nationwide study, concluded in 1954, listed ten California communities which had enacted such ordinances (103 U. Pa. L. Rev. 60, app. B, p. 108). Seven of the ten communities listed are within the Los Angeles metropolitan area. As of 1954 only 39 other communities in the entire United States are reported to have enacted similar ordinances (*id.*). The study also attempts to analyze the number of registrants (*id.*, **app. C**) and the number of persons charged with violation (*id.*, app. D), by community, but since some communities failed to reply, the report is admittedly incomplete. The incomplete reports, however, indicate zero registrants and none charged with violation in any California community outside of the Los Angeles metropolitan area.

[5]While there is very little case law on the subject, there is no lack of literature discussing criminal registration acts, most of which has been written in the last decade. Many of the writers indicate an active interest in the effect of such statutes upon the modern trend of penology to stress rehabilitation rather than punishment of criminals. Others approach the problem from the point of view of whether such registration statutes can accomplish their stated purpose of protecting society against the recidivistic criminal. Still others touch chiefly upon the moral and ethical concepts of decency, human dignity, and other theories regarding the assimilation and acceptance of the unfortunate. Most of the writers attack the policy and constitutionality of criminal registration statutes. Among others, see: Sutherland and Cressey, Principles of Criminology (5th ed. 1955), p. 590 et seq.; Barnes and Teeters, *New Horizons in Criminology; A Symposium of Crime and Correction* (ten separate articles), 23 Law & Contemp. Prob. 585-783. Articles and comments appearing in legal journals and dealing with this and closely allied subjects,

The ordinance here under attack has been before the United States Supreme Court in the case of *Lambert* v. *California,* 355 U.S. 225 [78 S.Ct. 240, 2 L.Ed.2d 228]. That court refused to pass upon the constitutionality of the statute *per se,* but held that the application thereof, in that case, was violative of the due process clause of the Fourteenth Amendment. The rationale of the decision was that the highest state court to which Lambert in that case might appeal (i.e., the appellate department of the superior court) had held that lack of knowledge of the existence of the statute was not available as a defense to Lambert and that in this type of ordinance due process requires knowledge as an essential element of the offense. The court therefore held that an attempt to convict in the absence of knowledge was unconstitutional.

The ordinance is silent as to scienter. The question as to whether a legislative intent to include knowledge or willful failure to register should be inferred was left undetermined by the United States Supreme Court.[6] If this court were to interpret the ordinance as not requiring knowledge, then the ordinance would be unconstitutional under federal law. On this point the Supreme Court of the United States has already

---

include: 33 Columb. L. Rev. 55; 43 Columb. L. Rev. 967; 7 De Paul L. Rev. 255; 66 Harv. L. Rev. 1203; 72 Harv. L. Rev. 77, pp. 183-185; 4 How. L. J. 250; 47 J. Crim. L., C. & P. S. 1; 23 Law & Contemp. Prob. 401, 433-436; 18 La. L. Rev. 726; 56 Mich. L. Rev. 1008; 42 Minn. L. Rev. 1043; 5 N.Y.L.F. 204; 19 Ohio St. L. J. 324; 32 Tul. L. Rev. 769; 6 U.C.L.A. L. Rev. 153; 6 U.C.L.A. L. Rev. 445; 103 U. Pa. L. Rev. 60; 19 U. Pitt. L. Rev. 21; 19 U. Pitt. L. Rev. 799; 6 Utah L. Rev. 124; 59 Yale L. J. 1351; 67 Yale L. J. 590. Many of the comments are on the decision in *Lambert* v. *California,* 355 U.S. 225 [78 S.Ct. 240, 2 L.Ed.2d 228], but all treat with some phase of criminal statutes in which scienter has not been made an element of the crime, or in which the personal condition of the accused, rather than an act or omission on his part, is an essential element. For articles dealing exclusively with recidivism, see: England, *A Study of Postprobation Recidivism Among 500 Federal Offenders,* 19 Fed. Prob. No. 2; Killinger, *Parole and Other Release Procedures, Contemporary Correction* (Tappan ed. 1951); Warren, *Probation in the Federal System of Criminal Justice,* 19 Fed. Prob. No. 3.

[6]Apparently the United States Supreme Court believed that such a judicial determination of the interpretation of state legislation was strictly a state matter, which it is, and yet was not willing to accept the opinion of the superior court as a final judicial determination by the California courts. It definitely confined its opinion to the constitutionality of the single application of the statute then before it, and left for the state courts to determine the constitutionality of the statute itself. This we are called upon to do, not only in this case but in the companion case of *Lambert* v. *Municipal Court* (L. A. No. 25598), which has arisen from the People's attempt to retry Lambert after the remittitur from the United States Supreme Court. (See *post,* p. 690 [3 Cal.Rptr. 168, 349 P.2d 984].)

spoken. But if we were to interpret the ordinance by implication to require knowledge as an element of the offense the decision in *Lambert* v. *California* would not be controlling. This is an interesting question, but for the reasons hereafter stated, we are not called upon to make such a determination in this case. This is so because we are of the opinion that the ordinance is unconstitutional because it attempts to legislate in a field already preempted by the state. In other words the respondent city has attempted to legislate in a field, and in a manner, beyond its constitutional power.

Respondents contend that the legislation is a reasonable exercise of the police power. Such an exercise of police power by a city must be based upon section 11 of article XI of the California Constitution, which provides that a city ''may make and enforce within its limits all such local, police, sanitary and other regulations as are not in conflict with general laws.'' By its very terms, this power is confined to a subject matter that is not in ''conflict'' with general laws. The appellate courts, in interpreting this clause, have laid down certain general and specific rules which act as guideposts to municipalities in this field. Consideration of those rules demonstrates that Los Angeles was without power to enact the instant ordinance.

 The power granted by section 11 of article XI is not only a delegation of power by the people to the local body, but it is also a limitation upon the local body (*In re Mingo,* 190 Cal. 769 [214 P. 850] ; *Cramer* v. *City of San Diego,* 164 Cal.App.2d 168, 170 [330 P.2d 235] ; *Lossman* v. *City of Stockton,* 6 Cal.App.2d 324 [44 P.2d 397] ; *Agnew* v. *City of Culver City,* 147 Cal.App.2d 144 [304 P.2d 788] ). A city has no power to legislate upon matters which are not of a local nature (*Pipoly* v. *Benson,* 20 Cal.2d 366, 369 [125 P.2d 482, 147 A.L.R. 515] ; *Lossman* v. *City of Stockton,* 6 Cal. App.2d 324, *supra,* at pp. 327-328, both holding that control of traffic on highways is not a local matter). When there is a doubt as to whether an attempted regulation relates to a municipal or to a state matter, or if it be the mixed concern of both, the doubt must be resolved in favor of the legislative authority of the state (*Ex parte Daniels,* 183 Cal. 636, 639-640 [192 P. 442, 21 A.L.R. 1172] ; *Lossman* v. *City of Stockton, supra*).

 These rules are not limited in their application to situations where a local body attempts to enact legislation the actual language of which conflicts with previously enacted

state law. These rules also prevent any legislation by a local body (other than in furtherance of the state law) when the entire field, that is the subject matter of the ordinance, has already been fully occupied by the state. Thus the Constitution prohibits a city from imposing additional requirements in a state occupied field (*James* v. *Myers*, 68 Cal.App.2d 23 [156 P.2d 69] ; *Agnew* v. *City of Los Angeles*, 51 Cal.2d 1 [330 P.2d 385] ), or from punishing the same act denounced by state law (*In re Mingo*, 190 Cal. 769, *supra*; *Ex parte Daniels*, 183 Cal. 636, *supra*).

The denial of power to a local body when the state has preempted the field is not based solely upon the superior authority of the state. It is a rule of necessity, based upon the need to prevent dual regulations which could result in uncertainty and confusion. Thus, the term "conflict" as used in section 11 of article XI has been held not to be limited to a mere conflict in language, but applies equally to a conflict of jurisdiction. In *Pipoly* v. *Benson, supra,* this court said, at pages 370-371: "Paradoxical as it may seem, it is apparent that an ordinance and a statute may be identical . . . and yet the ordinance is invalid because within the constitutional provision it is in conflict with the statute. . . . The invalidity arises, not from a conflict of language, but from the inevitable conflict of jurisdiction which would result from dual regulations covering the same ground. Only by such a broad definition of 'conflict' is it possible to confine local legislation to its proper field of *supplementary* regulation." Thus, whether the state has preempted the field to the exclusion of local legislation depends not only upon the language of the statutes adopted, but upon the purpose and scope of the legislative scheme. In applying this rule, the fields of licensing certain types of business activities (*Agnew* v. *City of Culver City, supra*), regulating traffic on public highways (*Pipoly* v. *Benson, supra*), presentation of claims for damages against local bodies (*Eastlick* v. *City of Los Angeles*, 29 Cal.2d 661 [177 P.2d 558, 170 A.L.R. 225] ), tests for loyalty as prerequisite to public employment (*Tolman* v. *Underhill*, 39 Cal.2d 708 [249 P.2d 280] ; *Bowen* v. *County of Los Angeles*, 39 Cal.2d 714 [249 P.2d 285] ), and labor's "right to work" (*Chavez* v. *Sargent*, 52 Cal.2d 162 [339 P.2d 801] ), have all been held to have been preempted by the state, to the exclusion of local legislation, not because the language in the state statutes denied the subject matter to local bodies, nor because the local body attempted to enact a measure

which would do violence to the already existing state provisions, but because there existed a statewide legislative scheme which was intended to occupy the field.

In *Pipoly* v. *Benson, supra,* this court discussed the governing principles and stated at pages 371-373: ''Where a statute and an ordinance are identical it is obvious that the field sought to be covered by the ordinance has already been occupied by state legislation. The exception to the general rule permitting additional local regulation has been also applied, however, in situations where it is not so apparent that the field is already occupied by a statute. In *Ex parte Daniels, supra,* it was held that, if such was the intent of the Legislature, a statute setting up a general scheme for the control of motor vehicles on the highways might constitutionally occupy the entire field so that local ordinances on the subject would be invalid. (*In re Murphy, supra;* *Atlas Mixed Mortar Co.* v. *City of Burbank, supra;* Grant, *op. cit. supra* at pp. 99-100.) 'The effect of these several decisions is to declare that whenever the State of California sees fit to adopt a general scheme for the regulation and control of motor vehicles upon the public highways of the state, the entire control over whatever phases of the subject are covered by state legislation ceases insofar as municipal or local legislation is concerned.' (*Atlas Mixed Mortar Co.* v. *City of Burbank, supra,* p. 663.) Under these circumstances, the ordinance is invalid because there is no room left for supplementary local regulation of the particular subject and any such legislation is necessarily inconsistent with the state law. The difficult question in such cases is whether the state law was intended to occupy the entire field. Where the statute contains language indicating that the Legislature did not intend its regulations to be exclusive, the general rule permitting additional supplementary local regulations has been applied. (*In re Iverson, supra,* p. 588; *Natural Milk Prod. Assn.* v. *San Francisco, ante,* p. 101 [124 P.2d 25]; *In re Simmons, supra,* p. 593.) Conversely where the statute contains express provisions indicating that the Legislature intends its regulations to be exclusive within a certain field, the courts have given effect to this intention. (*Ex parte Daniels, supra,* pp. 641-642; Grant, *op. cit. supra* at p. 102.) As was pointed out in the Daniels case, a mere prohibition of local regulation on a particular subject without any affirmative act of the Legislature occupying that

field would be ineffective. But where such a declaration accompanied a general scheme for the control of motor vehicles, the court said (pp. 642-643) : 'It was clearly the intention of the legislature to declare that the limitation upon speed fixed in the law shall be the only limitation controlling the conduct of the driver of a motor vehicle upon the streets and highways of the state. . . . It cannot be doubted that the legislature . . . intended to occupy the whole field of traffic regulation, and in construing these prohibitory clauses relating to the powers of local legislative bodies, such provisions should not be ignored as unconstitutionl [*sic*], if a reasonable or even a strained construction can be adopted which would give them a constitutional effect. . . . Indeed . . . the purpose of the legislature to prevent a reduction of speed limits, and a consequent lack of uniformity in such, is apparent. If this was the legislative purpose, such enactment is clearly within the scope of their constitutional power, and local ordinances fixing other and different rates of speed, *ipso facto,* conflict with the state legislation.' (See *People* v. *Huchstep,* 114 Cal.App. (Supp.) 769, 772 [300 P. 448].)''

In *Tolman* v. *Underhill, supra,* this court was considering the question of the validity of a locally imposed loyalty oath, and said, at page 712: ''Determination of the question whether the Legislature has undertaken to occupy exclusively a given field of legislation depends upon an analysis of the statute and a consideration of the facts and circumstances upon which it was intended to operate. . . . Where the Legislature has adopted statutes governing a particular subject matter, its intent with regard to occupying the field to the exclusion of all local regulation is not to be measured alone by the language used but by the whole purpose and scope of the legislative scheme. . . .''

Tested by these standards, an examination of the Penal Code demonstrates, in many ways, that the state has occupied the very field in which Los Angeles has attempted to legislate.

The Penal Code is divided into four parts. Part IV is entitled ''Prevention of Crimes and Apprehension of Criminals.'' As this title indicates the Legislature has provided a statewide scheme for crime prevention and criminal apprehension. This intent is further indicated by the various titles contained in part IV of the code. Title 1 deals with ''Investigation and Control of Crimes and Criminals.'' For

this purpose the Legislature has created a ''Bureau of Criminal Identification and Investigation'' which is empowered and given the duty to install and maintain files on all criminals, including descriptions, photographs, fingerprints, measurements and other pertinent information tending to identify the individual and the type of crime for which he has been convicted.[7] By virtue of sections 1107 and 1108 of the Penal Code it is made the duty of all local police officials to furnish the bureau with some of the very information which Los Angeles now seeks to obtain for itself rather than through the already developed state system.

In title 2 of part IV, the Legislature has provided a method of controlling crimes involving the use of concealed weapons, machine guns, pistols, tear gas, silencers, and similar items to which a portion of the Los Angeles ordinance is directed. That the state Legislature has not included as many types of crime within this specific portion of the statute as does the ordinance is merely indicative of the fact that the state Legislature did not deem such was necessary in the overall state scheme.

An examination of the Penal Code also indicates that the state Legislature has preempted the very field of registration as a means of apprehension of criminals. This it has done by expressly requiring registration in some instances and by inferentially rejecting it in others. Thus, in this basic respect the state statutes and the local ordinance are in conflict.

One example is to be found in articles 1 and 2 of chapter 2 of title 1 of part IV of the Penal Code. In the sections there included the Legislature has singled out arson as a crime of such a recidivistic nature as requires personal information of the whereabouts of the offender after release. In order to accomplish this result, these code sections require the report of release of such offenders from a penal institution or a hospital, together with the county of residence of the offender. It is significant that the Legislature did not require the released offender to furnish such information, but rather made it the duty of the releasing officials to furnish the same to the State Bureau of Criminal Investigation.

An example of where the state has directly occupied the field is to be found in the sex registration statute. By the enactment of Penal Code, section 290, the Legislature has

---

[7]See also the ''Bureau of Criminal Statistics,'' created by title 3 of part IV of the Penal Code.

required that all major sex offenders, after conviction and release, register with the local police officials in the city or county of their residence. The Los Angeles ordinance is not only made specifically applicable to the sex offenders mentioned in section 290, but also is made applicable to some sex offenders omitted from the operation of the state registration law. In addition, the ordinance attempts to provide harsher terms than provided by the state, and also attempts to cover certain offenders who do not reside in Los Angeles. Thus, the Los Angeles ordinance, insofar as it specifically includes sex offenders within its operation, is in direct conflict with the state law. Such conflict cannot be cured by deleting therefrom all application to sex offenders. This is so because it is the overall requirement of criminal registration which places this ordinance within the field which the state has preempted.

While it is true that Penal Code, section 290 is the only criminal registration statute enacted by the state, a review of various related state enactments concerning recidivistic criminology leads unerringly to the conclusion that the Legislature has adopted a clear policy based upon the dual presumptions that certain criminals are recidivistic and others are not, and that certain types of crime require registration and others do not.

In adopting the habitual criminal statutes (Pen. Code, §§ 644 and 3047-3050) the Legislature provided for protection of the public against all recidivistic criminals only after their habit of repetition had been determined by subsequent conviction. These statutes have been in effect, in one form or another, ever since 1923, and have been amended over and again. Since 1947, and during periods of amendment, the Legislature had before it its own example of a criminal registration statute (§ 290), yet it refrained from applying the provisions of the latter to any but sex offenders. The latter section has been amended time and again, and although its terms have been extended to include more types of sex offenses, *no other type of convicted person has been made subject to registration.*

Furthermore, in 1939 the state Legislature enacted those portions of the Narcotics Act (Health & Saf. Code, §§ 11712 et seq.) providing additional penalties for narcotic offenders who have been previously convicted. These penalties were originally applicable if the narcotic offender had been previously convicted of any other felony. In 1953 each of these sections was amended to limit the additional penalty to those situations wherein the defendant had previously committed a

narcotics offense. Thus, the Legislature gave full recognition to the recidivistic nature of narcotic offenders, and yet refrained from requiring registration (which it had already required of sex offenders).

In addition to the statutes above mentioned, the Legislature, by adopting laws and regulations covering the indeterminate sentence, probation, parole, setting aside conviction, and all other rehabilitation laws, has clearly shown its policy to be that rehabilitation of criminals is a paramount consideration.[8]

It thus appears that the penal system adopted by the state constitutes a complete legislative scheme intended to occupy the field. As part of this scheme the Legislature has determined: (1) that prevention of crime and apprehension of criminals is of statewide concern, subject to statutory regulation by the Legislature, (2) that criminal identification together with maintenance and dissemination of criminal statistics is best handled at state level, (3) that all persons who commit three or more felonies are personally recidivistic in character, (4) that arson, narcotics and sex offenses are types of crime apt to be recidivistic and which therefore require special and distinct treatment in the realm of both prevention and detection, and (5) that of the three, sex offenders only require registration for public protection. It is not fatal to this determination that the Legislature has not specifically declared this ''scheme'' or policy in so many words. Although we are dealing here with a general policy regarding crime detection and prevention, and find a legislative intent in a multiplicity of statutes, rather than in a single enactment, we may still be guided by the language of *Tolman* v. *Underhill,* 39 Cal.2d 708, *supra,* wherein it is said, at page 713, ''It is immediately apparent, upon applying these tests to the statutes here involved, that the loyalty of state employees is not a matter as to which there may reasonably be different standards and different tests but is, without doubt, a subject requiring uniform treatment throughout the state. As we have already seen, the Legislature has enacted a general and detailed scheme requiring all state employees to execute a prescribed oath relating to loyalty and faithful performance of duty, and it could not have intended that they must at the same time remain subject to any such additional loyalty oaths or declarations as the particular agency employing them might

---

[8]See title 8 of part II, and titles 1 (chapter 8), 6 and 7 of part III of the Penal Code.

see fit to impose. Multiplicity and duplication of oaths and declarations would not only reflect seriously upon the dignity of state employment but would make a travesty of the effort to secure loyal and suitable persons for government service.'' What was there said regarding the enactment of a detailed scheme by the state Legislature, and the requirement of uniform treatment throughout the state is even more applicable to crime prevention and detection than it is to tests for loyalty.

As recently as May of 1959 this court had before it an ordinance of the county of San Benito which attempted to enact a ''right to work'' law (*Chavez* v. *Sargent*, 52 Cal.2d 162 [339 P.2d 801]). The ordinance was held to violate section 11 of article XI of the California Constitution because the state had, as here, already preempted the field. In that case, as in the Tolman case which it followed, emphasis was placed upon the fact that ''the subject is one which, in our view, . . . requires uniform treatment throughout the state.'' It is equally true that any legislation which would deprive a class of citizens from moving freely between localities within the state is such a subject as requires uniform treatment.

 The ordinance is also in conflict with one or more state laws in the conventional and strictest sense of the word ''conflict.'' Penal Code, section 290, as already pointed out, provides for registration of certain sex offenders in the city or county of their residence, within 60 days of taking up such residence. The ordinance attempts to require the same registration of such persons within five days of taking up residence. The code section exempts certain classes of sex offenders from its operation, whereas the ordinance attempts to include these exempted classes. The code section confines the requirement of registration to the city or county of residence. The ordinance attempts to operate on all who pass through Los Angeles a certain number of times within a specified period, regardless of residence. The code section carefully provides for actual notice of the requirement of registration; the ordinance does not. The ordinance further provides harsher terms than the code section in regard to the information which the registrant is required to give. It follows that, insofar as sex offenders are concerned, the ordinance is definitely in conflict with Penal Code, section 290.

The ordinance is also in conflict with section 1203.4 of the Penal Code. By the terms of that section the state has adopted a policy of setting aside the conviction of a person who has successfully fulfilled the conditions of his probation, and ren-

dering such person free from all penalties and disabilities arising from such conviction. Registration of convicted persons has been held to be a penalty or disability (further punishment) which cannot properly be required after conviction has been set aside under the provisions of section 1203.4 (*Kelly* v. *Municipal Court*, 160 Cal.App.2d 38 [324 P.2d 990]). Despite this fact, the Los Angeles ordinance, in subdivision (f) of section 52.38, specifically attempts to include within its requirements some persons whose convictions have ''been set aside at the termination of probation.'' Thus the ordinance conflicts with state law whether it be tested by either the liberal or the strict definition of the word ''conflict.''

Appellant has also attacked the ordinance on many other grounds arising under both the federal and the state Constitutions. Thus he attacks the reasonableness of the classification of persons to whom the ordinance applies, and claims the denial of the equal protection of law. He also claims the improper delegation of legislative authority to the chief of police, the abridgement of privileges and immunities, and other allied constitutional questions. In view of the holding that the city is without constitutional power to enact the ordinance under state law, it is unnecessary to discuss these points.

The judgment is reversed and remanded with instructions to the trial court to enter judgment consistent with the views expressed herein.

Gibson, C. J., Traynor, J., Schauer, J., Spence, J., McComb, J., and Tobriner, J. pro tem.,* concurred.

Respondents' petition for a rehearing was denied March 23, 1960. Tobriner, Judge pro tem.,* participated therein in place of White, J., who deemed himself disqualified.

*Assigned by Chairman of Judicial Council.