*579 LIU, J., Dissenting.
I join Justice Werdegar’s dissent. I write separately to highlight additional shortcomings in the court’s analysis that prevent it from properly resolving this case.
The court holds that article XI, section 5 of the California Constitution, the municipal home rule provision, bars the Legislature from requiring charter cities to pay prevailing wages to construction workers on public works projects. While generally stating the applicable law correctly, the court fails to bridge the wide analytical gap between that law and the result it reaches. The court employs a vague analysis that puts great weight on a few factors while refusing to consider other factors that the opinion itself concedes are pertinent to determining whether the prevailing wage law should apply to charter cities. As a result, no clear legal principle emerges from the court’s opinion, even as it repeatedly insists that the issue before us is a question of law.
Today’s decision is a misstep as a matter of method as well as result. Unlike cases where a state law limits a municipal prerogative specifically protected by constitutional text, the instant dispute is one “with no unmistakable signs to guide us between the domain of state and local powers.” (Ex parte Daniels (1920) 183 Cal. 636, 640 [192 P. 442].) Accordingly, our instinct toward judicial restraint should be at its peak. The court, however, casts restraint aside and arbitrarily curtails the Legislature’s power. Because the court moves incautiously in an area where “it becomes us to exercise more than the usual caution” (ibid,.), I respectfully dissent.
I.
Article XI, section 5, subdivision (a) of the California Constitution provides: “It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith.” Subdivision (b) further provides: “It shall be competent in all city charters to provide, in addition to those provisions allowable by this Constitution, and by the laws of the State for: (1) the constitution, regulation, and government of the city police force[,] (2) subgovernment in all or part of a city[,] (3) conduct of city elections[,] and (4) plenary authority is hereby granted, subject only to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several municipal officers and employees whose compensation is paid by the city *580 shall be elected or appointed, and for their removal, and for their compensation, and for the number of deputies, clerks and other employees that each shall have, and for the compensation, method of appointment, qualifications, tenure of office and removal of such deputies, clerks and other employees.” (Italics added.)
As the court correctly states, under this article “the ordinances of charter cities supersede state law with respect to ‘municipal affairs’ . . . but state law is supreme with respect to matters of ‘statewide concern.’ ” (Maj. opn., ante, at p. 552, citation omitted.) Determining what constitutes a “municipal affair” or a “matter of statewide concern” in the course of resolving conflicts between state mandates and municipal prerogatives has not been an easy task. Nevertheless, several important principles have emerged from our cases.
First, when we have considered California Constitution article XI, section 5 and similar constitutional home rule provisions for counties and for the University of California, we have been most protective of home rule prerogatives explicitly recognized in the text of our Constitution. Most prominently, we have limited or invalidated state laws that unduly interfere with the prerogative of local governments to set the salaries of their own employees. (See County of Riverside v. Superior Court (2003) 30 Cal.4th 278 [132 Cal.Rptr.2d 713, 66 P.3d 718]; San Francisco Labor Council v. Regents of the University of California (1980) 26 Cal.3d 785 [163 Cal.Rptr. 460, 608 P.2d 277]; Sonoma County Organization of Public Employees v. County of Sonoma (1979) 23 Cal.3d 296 [152 Cal.Rptr. 903, 591 P.2d 1] (County of Sonoma).)
Second, in determining whether a state statute may be applied to a charter city, we have examined the “extramural” or “extramunicipal” dimension of the statute—that is, the reach of the statute beyond merely controlling local matters. (California Fed. Savings & Loan Assn. v. City of Los Angeles (1991) 54 Cal.3d 1, 17, 23-24 [283 Cal.Rptr. 569, 812 P.2d 916] (CalFed).) A strong extramunicipal dimension supports the conclusion that the statute may be imposed on charter cities. (See ibid.; Baggett v. Gates (1982) 32 Cal.3d 128, 138-140 [185 Cal.Rptr. 232, 649 P.2d 874]; Pac. Tel. & Tel. Co. v. City & County of San Francisco (1959) 51 Cal.2d 766, 775-776 [336 P.2d 514] {Pacific Telephone).) In making this determination, we have examined not simply the statute’s stated goals, but also whether the statute is reasonably related to those goals. {Johnson v. Bradley (1992) 4 Cal.4th 389, 410 [14 Cal.Rptr.2d 470, 841 P.2d 990].) Statutes that seek to micromanage municipal affairs without any clear extramunicipal objective have been held inapplicable to charter cities. (See, e.g., County of Sonoma, supra, 23 Cal.3d at pp. 317-318 [finding no extramunicipal statewide concern to justify a state law restricting state funds to cities that grant cost-of-living increases to their employees].)
*581 Third, courts will also assess the degree to which a state law actually intrudes into municipal prerogatives. The fact that a state law constrains local decisionmaking, even in traditional areas of home rule, does not by itself establish a sufficient degree of intrusion to render the state law inapplicable to charter cities. Thus, for example, we have held that state law may govern numerous aspects of employment relations where the state law allows local governments the ultimate say in managing and compensating their employees. (See People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach (1984) 36 Cal.3d 591, 600 [205 Cal.Rptr 794, 685 P.2d 1145] (Seal Beach) [“[I]n an unbroken series of public employee cases, ... it has been held that a ‘general law prevails over local enactments of a chartered city, even in regard to matters which would otherwise be deemed to be strictly municipal affairs, where the subject matter of the general law is of statewide concern.’ [Citation.]”]; id. at p. 601 [statutory duty to meet and confer with employees over changes in conditions of employment applies to charter cities]; Baggett v. Gates, supra, 32 Cal.3d at p. 140 [Public Safety Officers’ Procedural Bill of Rights applies to charter cities]; Professional Fire Fighters, Inc. v. City of Los Angeles (1963) 60 Cal.2d 276, 294-295 [32 Cal.Rptr. 830, 384 P.2d 158] [statutory right of firefighters to join unions applies to charter cities].)
Fourth, in considering what constitutes a municipal affair or statewide concern, “courts should avoid the error of ‘compartmentalization, ’ that is, of cordoning off an entire area of governmental activity as either a ‘municipal affair’ or one of statewide concern.” (CalFed, supra, 54 Cal.3d at p. 17.) The reason courts should avoid such compartmentalization is that “ ‘the constitutional concept of municipal affairs is not a fixed or static quantity . . . [but one that] changes with the changing conditions upon which it is to operate.’ ” (Id. at pp. 17-18, quoting Pacific Telephone, supra, 51 Cal.2d at p. 771.) This principle has operated with particular force when the case involves asserted home rule prerogatives not explicitly protected by the text of Constitution article XI, section 5. (See CalFed, supra, 54 Cal.3d at pp. 17-18 [upholding state law displacing municipal tax on savings banks]; Pacific Telephone, supra, 51 Cal.2d at p. 766 [upholding state law displacing municipal control of construction and maintenance of telephone lines].)
A corollary of this fourth principle is that in order to determine the shifting boundaries between state and municipal legislative power, courts will engage in a factual inquiry to understand the nature of historical changes relevant to the determination. In some cases, the evidence considered will be general, judicially noticeable facts. (See, e.g., Pacific Telephone, supra, 51 Cal.2d at p. 776 [relying on “a vast change in conditions” related to telephone service over the previous 50 years to conclude that placing telephone lines in city streets “is not at the present time a municipal affair but is a matter of statewide concern”].) In other cases, the factual inquiry has involved an examination of legislative findings and evidence in the trial record. (See *582 CalFed, supra, 54 Cal.3d at pp. 21-24 & fn. 21 [engaging in extensive analysis of legislative and trial court findings to conclude that a statute eliminating the power of local entities to tax savings banks applies to charter cities].) As CalFed explained: “When a court invalidates a charter city measure in favor of a conflicting state statute, the result does not necessarily rest on the conclusion that the subject matter of the former is not appropriate for municipal regulation. It means, rather, that under the historical circumstances presented, the state has a more substantial interest in the subject than the charter city.” (Id. at p. 18.) At the same time, “a decision favoring a charter city measure [does not] preclude superseding state legislation in a later case if the fact-bound justification—the statewide dimension—is subsequently demonstrated.” (Ibid.) “[T]he hinge of the decision,” CalFed said, “is the identification of a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession based on sensible, pragmatic considerations.” (Ibid., italics added.)
Finally, and critically, we have long held that “[w]hen there is a doubt as to whether an attempted regulation relates to a municipal or to a state matter, or if it be the mixed concern of both, the doubt must be resolved in favor of the legislative authority of the state.” (Abbott v. City of Los Angeles (1960) 53 Cal.2d 674, 681 [3 Cal.Rptr. 158, 349 P.2d 974]; see CalFed, supra, 54 Cal.3d at p. 24; Baggett v. Gates, supra, 32 Cal.3d at p. 140.) The basis for this rule was articulated long ago in Ex parte Daniels, supra, 183 Cal. at p. 640: “ ‘with no unmistakable signs to guide us between the domain of state and local powers, it becomes us to exercise more than the usual caution not to refuse the sanction of judicial authority to legislation which is supposed to have exceeded a boundary so difficult to locate and define.’ ” This principle is a variant of the general proposition, rooted in the separation of powers, that “ ‘ “[i]f there is any doubt as to the Legislature’s power to act in any given case, the doubt should be resolved in favor of the Legislature’s action. Such restrictions and limitations [imposed by the Constitution] are to be construed strictly (Pacific Legal Foundation v. Brown (1981) 29 Cal.3d 168, 180 [172 Cal.Rptr. 487, 624 P.2d 1215], bracketed language and italics in Pacific Legal Foundation, italics omitted.)
With these principles in mind, let us now examine today’s opinion.
II.
The court ignores or misapplies the principles above in conducting its analysis. First and foremost, the court discounts as irrelevant the record evidence demonstrating the state’s extramunicipal interest in supporting construction labor markets and apprenticeship programs. Although the Court of Appeal below concluded that the evidentiary record and legislative findings *583 were insufficient to establish that the prevailing wage law significantly furthered the state’s interests, the court rejects this approach. It proceeds instead on the theory that the facts demonstrating the state’s interest merit little or no consideration because the issue before us is a question of law. “Factual findings by the Legislature or the trial court... are not controlling. [Citation.] The decision as to what areas of governance are municipal concerns and what are statewide concerns is ultimately a legal one.” (Maj. opn., ante, at p. 558.)
But the court jousts with a strawman. No one suggests that factual findings by the Legislature or trial court should be “controlling.” The important point, amply supported by our precedents (see ante, at pp. 581-582), is that such findings are relevant to the inquiry. The court actually acknowledges this point, as it must, when it says “[o]f course, the inquiry is not wholly removed from historical, and hence factual, realities” (maj. opn., ante, at p. 557) and then recites the above quoted guidance from CalFed, supra, 54 Cal.3d at pages 17-18, emphasizing the factual and historical nature of the inquiry. This recitation turns out to be an empty gesture, however, for one searches in vain for any discernible application of CalFed’s guidance in the court’s analysis of the prevailing wage law. Simply put, there is none.
That is not to say that the historical and factual justifications for the prevailing wage law go unmentioned in today’s opinion. The court devotes four detailed paragraphs to describing a declaration submitted by an expert for plaintiff State Building and Construction Trades Council of California, AFL-CIO. (Maj. opn., ante, at pp. 560-562.) As the court says, the declaration explains file prevailing wage law’s beneficial effects on construction labor markets, the increasing regionalization of those labor markets as workers travel long distances to a jobsite, the fact that wages are generally set regionally rather than locally, and the importance of the prevailing wage law in supporting apprenticeship programs that train the next generation of skilled workers. (Ibid.)
After reading this lengthy and quite plausible explanation of why the Legislature enacted the prevailing wage law, one might expect some analysis that examines how much weight the historical and factual underpinnings of the law should have in determining whether it addresses a matter of statewide concern. One might expect some explanation, in light of the court’s holding, of why the record falls short of identifying “a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative super-session based on sensible, pragmatic considerations.” (CalFed, supra, 54 Cal.3d at p. 18.) But rather than assess the record evidence, the court simply waves it away and changes the subject: “Certainly regional labor standards and the proper training of construction workers are statewide concerns when *584 considered in the abstract. But the question presented here is not whether the state government has an abstract interest in labor conditions and vocational training. Rather, the question presented is whether the state can require a charter city to exercise its purchasing power in the construction market in a way that supports regional wages and subsidizes vocational training, while increasing the charter city’s costs. No one would doubt that the state could use its own resources to support wages and vocational training in the state’s construction industry, but can the state achieve these ends by interfering in the fiscal policies of charter cities? . . . ' “[W]e can think of nothing that is of greater municipal concern than how a city’s tax dollars will be spent; nor anything which could be of less interest to taxpayers of other jurisdictions.” ’ {Johnson v. Bradley, supra, 4 Cal.4th at p. 407.) Therefore, the Union here cannot justify state regulation of the spending practices of charter cities merely by identifying some indirect effect on the regional and state economies.” (Maj. opn., ante, at p. 562, original italics.)
This passage merits several comments. To begin with, in labeling the state’s interest “abstract,” the court does nothing more than employ a rhetorical device to diminish the importance of that interest. The court does not explain in what sense the state’s interest in supporting regional labor markets and apprenticeship programs designed to maintain a highly skilled, well-paid construction workforce throughout California is “abstract.” Surely the court is not faulting the Legislature, the representative body for our entire state, for legislating on the basis of labor market trends, public policy goals, and laws of supply and demand that have not been particularized to, say, the City of Vista or San Diego County. If the court is instead using “abstract” to mean that the Legislature has not sufficiently demonstrated that the prevailing wage law will truly benefit regional labor markets and support apprenticeship programs, then one would expect the court to hold, with the Court of Appeal, that there was insufficient evidence in the record to establish the law’s efficacy. But the court rejects that position, so the sufficiency of the evidence cannot really be the court’s concern.
If the court uses the term “abstract” to mean that the present inquiry requires us to consider the statewide concern not in isolation but in relation to the asserted municipal interests, then I agree. But if we are to assess the relative strengths of the state and local interests, then why should we not look to evidence bearing on the respective strengths of those interests? That is precisely the kind of evidence we examined in CalFed to determine that the state acted constitutionally in eliminating what had formerly been a local prerogative. (CalFed, supra, 54 Cal.3d at pp. 21-24 & fn. 21.) It is also the kind of evidence pertinent to assessing whether the extramunicipal dimension of the state law at issue is robust or trivial. (See ante, at p. 580.) Yet the court simply dismisses the state interest as “abstract” without any meaningful evaluation of its factual and historical underpinnings.
*585 The court instead focuses on the fact that the state seeks to regulate a charter city’s purchasing power in a manner that “increases] the charter city’s costs.” (Maj. opn., ante, at p. 562.) But it is hardly clear that a charter city’s interest in how its tax dollars are spent is any less abstract for present purposes than the state’s interest in its legitimate policy goals. Our precedents unambiguously indicate that a charter city’s general interest in controlling its tax dollars is not by itself sufficient to render inapplicable a state law that addresses a statewide concern. In Seal Beach, supra, 36 Cal.3d 591, for example, we held that the “meet and confer” requirement of the MeyersMilias-Brown Act (MMBA; Gov. Code, § 3500 et seq.) did not conflict with the prerogatives of a charter city to propose charter amendments affecting employment relations. As a sheer matter of dollars and cents, the marginal cost to cities of administering the MMBA, which requires city management to negotiate to impasse with its employees regarding compensation and other employment terms, is probably at least as great as requiring cities to pay a prevailing wage when they contract out for public works. The statutory protections to assure fair labor practices in police departments and fire departments that we upheld against home rule challenges in Baggett v. Gates, supra, 32 Cal.3d 128, and Professional Fire Fighters, Inc. v. City of Los Angeles, supra, 60 Cal.2d 276, respectively, likewise imposed substantial monetary costs on the affected municipalities. Indeed, almost every state regulation, including laws specifically directed at government entities, impacts the way a city spends its money and other resources. In addition to labor and employment laws, environmental laws like the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) require the expenditure of substantial municipal resources to enforce. Unless the court intends to invite home rule challenges to a very broad swath of state laws, the fact that a state law increases a charter city’s costs or otherwise constrains what a city can do with its money cannot be the determinative factor, or even the primary factor, in the present analysis.
While forcefully invoking the city’s fiscal interests (see maj. opn., ante, at p. 562 [“Autonomy with regard to the expenditure of public fluids lies at the heart of what it means to be an independent governmental entity.”]), the court does not acknowledge, much less grapple with, the readily apparent limitations on this rationale for immunizing a charter city from an otherwise applicable state law. Instead, the court opts for an undiscriminating, categorical approach that holds the prevailing wage law inapplicable to charter cities, no matter how strong the state’s interest or how slight the intrusion into the charter city’s treasury. Notably, the City of Vista has not put forward any evidence indicating how much, if at all, the prevailing wage law would increase the city’s costs for the public works projects at issue. One might wonder, on the principle that you get what you pay for, whether the higher wages required by the prevailing wage law are at least partially offset by the *586 higher productivity of better paid, better skilled workers. (See Mahalia, Prevailing Wages in Government Contract Costs: A Review of the Research (2008) p. 2.) Because the court’s reasoning does not depend on any facts as to how much the prevailing wage law will actually increase the city’s costs, presumably even an increase of one dollar must be held to invade the “heart” of the city’s autonomy. (Maj. opn., ante, at p. 562.)
The extremity of such a conclusion is a symptom of additional problems with the court’s categorical approach. The majority relies on precedent, chiefly this court’s 80-year-old decision in City of Pasadena v. Charleville (1932) 215 Cal. 384, 389 [10 P.2d 745] (Charleville). (Maj. opn., ante, at p. 560.) But, as Justice Werdegar points out, Charleville’s reasoning that the prevailing wage law does not address a matter of statewide concern is based largely on a thoroughly discredited conception of constitutional limitations on economic legislation. (See dis. opn. of Werdegar, J., ante, at pp. 570-571.) I would add that the Charleville court’s notion of a state law that does address a matter of statewide concern—the Public Works Alien Employment Act, which barred aliens from being employed on public works projects (see Charleville, at pp. 399-400 [analogizing the statute to California’s Alien Land Law, which prohibited the sale of agricultural land to aliens])—has been equally discredited. (See Oyama v. California (1948) 332 U.S. 633 [92 L.Ed. 249, 68 S.Ct. 269] [invalidating California’s Alien Land Law under the equal protection clause]; see also Graham v. Richardson (1971) 403 U.S. 365, 372 [29 L.Ed.2d 534, 91 S.Ct. 1848] [state classifications based on alienage are “inherently suspect and subject to close judicial scrutiny”].)
It is beyond dispute that construction labor markets have become increasingly regional since Charleville was decided. (Maj. opn., ante, at p. 561; dis. opn. of Werdegar, J., ante, at p. 574.) Given that fact as well as obvious and important changes in the legal landscape since 1932, it is mystifying that the court does not flinch in continuing to follow a Lochner-era precedent built on Lochner-era premises. (Lochner v. New York (1905) 198 U.S. 45 [49 L.Ed. 937, 25 S.Ct. 539].) But more than mystifying, the court’s ready adherence to Charleville is indefensible under the very precedents that the court elsewhere recites and even italicizes. If Charleville’s holding is not worthy of reconsideration, then what is left of the precept that “ ‘ “the constitutional concept of municipal affairs is not a fixed or static quantity . . . [but one that] changes with the changing conditions upon which it is to operate” ’ ”? (Maj. opn., ante, at p. 557, quoting CalFed, supra, 54 Cal.3d at pp. 17-18, quoting Pacific Telephone, supra, 51 Cal.2d at p. 771, italics added by the court.) The court commits the very “error of ‘compartmentalization’ ” that CalFed warned against by “cordoning off’ the wages paid by local public works contractors as a “municipal affair.” (CalFed, at p. 17.) If there is room in today’s opinion for a superseding prevailing wage law to survive home rule challenge “in a *587 later case” based on a future “fact-bound justification” (id. at p. 18), I fail to see it—and the court does not (because it cannot) say there is.
Even without CalFed’s specific instruction to analyze the constitutional concept of municipal affairs on the basis of changing historical circumstances, there is ample reason to reconsider Charleville under the doctrine of stare decisis. That doctrine authorizes a court to revisit precedent when “related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine [citation]” and when “facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification [citation].” (Planned Parenthood of Southeastern Pa. v. Casey (1992) 505 U.S. 833, 855 [120 L.Ed.2d 674, 112 S.Ct. 2791] (plur. opn. by O’Connor, J.); see Moradi-Shalal v. Fireman’s Fund Ins. Companies (1988) 46 Cal.3d 287, 297 [250 Cal.Rptr. 116, 758 P.2d 58] [overturning a nine-year-old precedent on the ground that “reexamination of precedent may become necessary when subsequent developments indicate an earlier decision was unsound, or has become ripe for reconsideration”].) Charleville easily satisfies these criteria.
In addition to relying on questionable precedent, the court reaches its categorical holding by denying any relevant distinction between a charter city’s interest in controlling the wages of its own employees and its interest in controlling the wages of employees of private contractors building public works: “If, as the Union contends, the prevailing wage law’s shift from a purely local focus to a regional focus has made the wage levels of workers constructing locally funded public works a matter of statewide concern, then that would be true whether the case involved public employees or private employees.” (Maj. opn., ante, at p. 564.) This statement is the predicate for the court’s reliance on our cases holding that the Legislature may not directly dictate the compensation of charter city employees. (Id. at pp. 562-564, discussing County of Riverside v. Superior Court, supra, 30 Cal.4th 278; San Francisco Labor Council v. Regents of the University of California, supra, 26 Cal.3d 785; County of Sonoma, supra, 23 Cal.3d 296.)
But the court’s position ignores key differences in the nature of the local interest involved. Most importantly, municipal control of employee compensation, unlike control of the wages of contract employees, is explicitly protected by the text of article XI, section 5, subdivision (b) of the California Constitution and similar constitutional home rule provisions. (See ante, at pp. 579-580.) Moreover, as a practical matter, the two types of control are not comparable. Employee salaries make up the vast majority of a municipality’s budget. In Los Angeles, for example, employee salaries comprise 85 percent of the budgets of city departments. (See Los Angeles Mayor Antonio Villaraigosa, Mayor’s Office Web site, Balanced Budget, Frequently Asked Questions, *588 <http://mayor.lacity.org/Issues/BalancedBudget/FrequentlyAskedQuestions/ index.htm> [as of July 2, 2012].) Interference with employee salaries would thus have an enormous, ongoing impact on city finances. And if the state sought to control the salaries of only some city employees, such control would interfere with the city’s ability to set salary schedules and pay differentials for its employees, decisions which in turn affect matters of employee morale, retention, and workforce cohesion that indeed go to the heart of municipal autonomy. Interference with employee salaries would also likely affect a municipality’s long-term pension obligations. None of these concerns is implicated when the state sets a floor for the wages of employees of a company with which a city temporarily does business to construct a public work. This is not a case about whether a state law can control employee salaries; it is about whether a state law can raise the cost of a municipal public work in order to further otherwise legitimate policy goals.
The court relies on two other factors to support its holding. First, it contends that “a state law of broad general application is more likely to address a statewide concern than one that is narrow and particularized in its application.” (Maj. opn., ante, at p. 564.) “[T]he state law at issue is not a minimum wage law of broad general application; rather, the law at issue here has a far narrower application, as it pertains only to the public works projects of public agencies.” (Ibid.) This lack of general application “further undermine[s] the Union’s assertion that the matter here presents a statewide concern and therefore requires Vista, a charter city, to comply with the state’s prevailing wage law on the city’s locally funded public works projects.” (Id. at p. 565.)
I agree that the general applicability of a state law to public as well as private entities supports the conclusion that the law has an important extra-municipal dimension. However, as a matter of fact and logic, there is no reason to suppose that a state law’s lack of general applicability means it does not have a significant extramunicipal dimension. The court asserts that, in contrast to a minimum wage law, “the law at issue here has a far narrower application, as it pertains only to the public works projects of public agencies.” (Maj. opn., ante,' at p. 564, italics added.) Yet public works projects are a multibillion-dollar annual enterprise in California, and charter cities, which contain over half the state’s population (see dis. opn. of Werdegar, J., ante, at p. 578, fn. 7), no doubt account for a substantial share of those dollars. Instead of regulating this vast enterprise by imposing statewide minimum wages for construction workers through general legislation applicable to private and public entities, the Legislature has chosen to influence such wages through the market-based approach of directing the purchasing power of public entities to support union-level wages. Instead of indicating that the prevailing wage law is not a matter of statewide concern, the application of the law only to public entities plausibly represents a *589 legislative judgment that direct regulation of private labor markets is not necessary to accomplish the statute’s goals given the substantial role that public works projects play in influencing private sector construction workers’ wages and in supporting apprenticeship programs. As the court acknowledges, prevailing wage laws have long been in use, in California and throughout the country, to accomplish these goals. (Maj. opn., ante, at pp. 554-555; see also dis. opn. of Werdegar, J., ante, at pp. 577-578, fns. 5, 6.) What basis is there for insisting that only more intrusive state laws that regulate both private and public sectors may be applied to charter cities?
The other factor on which the court relies is that “state laws at issue set forth generally applicable procedural standards, and consequently impinged less on local autonomy than if they had imposed substantive obligations.” (Maj. opn., ante, at p. 564.) It is true that our decision in Seal Beach, upholding the MMBA’s “meet and confer” requirement, observed that the city council “retains the ultimate power to refuse an agreement and to make its own decision.” (Seal Beach, supra, 36 Cal.3d at p. 601.) In a footnote, “[w]e emphasize[d] that there is a clear distinction between the substance of a public employee labor issue and the procedure by which it is resolved.” (Id. at p. 600, fn. 11, original italics.) But this factor is not dispositive. Seal Beach may be read to say that procedural laws will generally survive a home rule challenge, not that substantive laws generally won’t. Both CalFed, supra, 54 Cal.3d 1, which came after Seal Beach, and Pacific Telephone, supra, 51 Cal.2d 766, which remains good law, upheld state statutes that foreclosed municipalities from making substantive decisions in important areas of local concern. The substantive nature of the prevailing wage law is one factor to be considered together with all the others discussed above.
III.
Perhaps the most serious error in the court’s analysis is its disregard for the principle that doubts about whether a law is a matter of statewide concern must be resolved in favor of the legislative authority of the state. (Abbott v. City of Los Angeles, supra, 53 Cal.2d at p. 681; Ex parte Daniels, supra, 183 Cal. at p. 640.) Although the present dispute involves a contest between two levels of democratic decisionmaking—local and state—one should not think that democracy (of some kind) will be the winner no matter how we rule. If we were to uphold the prevailing wage law, charter cities could still bring their complaints to the Legislature through the ordinary political process, and it seems at least plausible that state legislators would be attentive to the concerns of local officials on whom they often depend for political support. However, having declared the prevailing wage law unconstitutional as applied to charter cities, the court has placed the issue beyond the ordinary political process. As Justice Werdegar notes, this court’s decisions on the meaning of *590 the California Constitution can be corrected only by a constitutional amendment. (Dis. opn. of Werdegar, J., ante, at p. 567.) It is hard to believe that in this case, where the text of our Constitution provides no clear answer, the correct outcome is so utterly free of doubt that our usual instinct toward judicial restraint may be abandoned.
In fairness, there is no reason to expect that any single factor will properly resolve the case before us. The factors that the court does consider—the possible costs to the city, the law’s lack of general applicability, the law’s substantive as opposed to procedural character—may validly be used to assess the state’s and the city’s relative interests. But the court refuses to undertake a factual or historical inquiry to determine the relative strengths of the state and municipal interests, even though that is what our precedents instruct. The court refuses to reconsider Charleville, supra, 215 Cal. 384, even though its legal and factual underpinnings have been thoroughly eroded over eight decades. The court refuses to see any distinction between municipal control of its own employees’ wages and municipal control of the wages of a contractor’s employees, even though the former is more likely to disrupt local autonomy and, unlike the latter, is explicitly protected by the text of our Constitution.
I have no objection to an all-things-considered approach to the present inquiry because it is probably the best we can do. But such an approach (1) must truly consider all relevant aspects of the inquiry, not just an arbitrary few; (2) should lead us to reach fairly limited holdings instead of categorical pronouncements; and (3) should cause us “to exercise more than the usual caution” before invalidating the work of a coequal, politically representative branch of government (Ex parte Daniels, supra, 183 Cal. at p. 640). Today’s decision violates all three precepts in arriving at a fixed conception of municipal autonomy that is neither rooted in the language of our Constitution nor consistent with current realities.
As Justice Werdegar explains (dis. opn. of Werdegar, J., ante, at pp. 573-576), the record evidence indicates that the prevailing wage law is a reasonable means of supporting regional construction labor markets and apprenticeship programs. There is no question that the law interferes with municipal autonomy. But the law does not invade any local prerogative expressly protected by constitutional text. And it is not clear that the law’s interference with municipal autonomy is excessive in relation to the legitimate public purposes that the Legislature aims to achieve. There is, in this case, “a convincing basis for legislative action originating in extramunicipal *591 concerns, one justifying legislative supersession based on sensible, pragmatic considerations.” (CalFed, supra, 54 Cal.3d at p. 18.) But even if there were some doubt, judicial restraint should prevail.
I respectfully dissent.
Werdegar, J., concurred.