[No. A026125. First Dist., Div. Three. Feb. 28, 1986.]

NORTHERN CALIFORNIA PSYCHIATRIC SOCIETY et al.,
Plaintiffs and Respondents, v.
CITY OF BERKELEY, Defendant and Appellant;
COALITION TO STOP ELECTROSHOCK, Movant and Appellant.

## COUNSEL

Natalie E. West, City Attorney, and Manuela Albuquerque, Deputy City Attorney, for Defendant and Appellant.

David Ferleger and Samuel E. Trosow for Movant and Appellant.

Severson, Werson, Berke & Melchior, Kurt W. Melchior, Mark Joseph Kenney, Onek, Klein & Farr and Joel I. Klein for Plaintiffs and Respondents.

Hassard, Bonnington, Rogers & Huber, David E. Willett, Catherine I. Hanson and Richard R. Sheridan as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**WHITE, P. J.**—The City of Berkeley, California, appeals from summary judgment entered in favor of The National Association of Private Psychiatric Hospitals, national, state and local professional psychiatric associations, and Ronald Bortman, M.D., an individual psychiatrist and Berkeley taxpayer. We affirm.

I

On November 2, 1982, the voters of Berkeley adopted a local initiative measure, which was subsequently formally enacted by the Berkeley City Council as Berkeley City Ordinance 5504 (Ordinance 5504). Ordinance 5504 absolutely prohibited "[t]he administration of electric shock treatment to any person within the City of Berkeley," declared any violation of the ordinance to be a misdemeanor, and imposed criminal punishment of up to six months imprisonment, $500 fine, or both, for any such violation.

· On December 14, 1982, respondents brought suit for a judicial declaration that Berkeley City Ordinance 5504 was unconstitutional, invalid and void on its face, and to enjoin enforcement of the ordinance. The trial court issued a preliminary injunction against enforcement of the ordinance on January 18, 1983. On July 10, 1983, respondents filed their motion for summary judgment. The motion was heard and argued on July 15, 1983. On September 27, 1983, an ex parte motion for leave to intervene was filed by the Coalition to Stop Electroshock (the Coalition), an organization which had previously filed an amicus curiae brief on January 12, 1983, in support of the City of Berkeley. This ex parte motion was denied. The Coalition then filed a formal noticed motion to intervene on October 14, 1983.

· On November 1, 1983, the trial court filed its order granting the motion for summary judgment and entered judgment for respondents, permanently enjoining the City of Berkeley from enforcing Ordinance 5504 and declaring it "unconstitutional and void." Following the trial court's denial of Berkeley's motion for reconsideration and of the Coalition's motion to intervene on December 14, 1983, both Berkeley and the Coalition appealed.

## II

The subject of the underlying lawsuit and of this appeal is electroconvulsive therapy (ECT), popularly known as electric shock treatment, and referred to as such by Ordinance 5504. " ' "Shock" treatment, more accurately termed "electroconvulsive therapy" is the name given to a group of therapies which involve passing electrical currents through the brain in order to induce convulsions. The therapeutic effects of ECT are generally believed to be obtained by the seizure produced by the stimulation of the central nervous system. The risks attending such treatment have been greatly reduced by the use of muscle relaxants and general anesthetics, which greatly reduce the body convulsions that led to bone fractures in the past. The mechanism by which ECT confers its benefits is still unknown, but two facts stand out in almost every discussion of the treatment: first, ECT does relieve symptoms of certain mental illnesses, most notably acute depression, and is widely recognized therapy for obtaining remission of those symptoms; second, ECT has several adverse effects, including memory loss and intellectual disorientation. The extent of memory loss and the risk of permanent memory loss are not fully known or agreed upon, but the fact of memory loss is not questioned. The risk of other adverse effects is possible, since the procedure is still so little understood. Those possible risks include permanent brain damage in the local area of the electrodes and a slowing of brain waves. The outstanding features of ECT, then, are its acknowledged benefits in the treatment of certain illnesses, and the intrusive and

possibly hazardous character of the treatment.' [Citation.]" (*Lillian F.* v. *Superior Court* (1984) 160 Cal.App.3d 314, 317 [206 Cal.Rptr. 603].)

■ Recognizing both the "intrusive and possibly hazardous character" of ECT, and "its acknowledged benefits in the treatment of certain illnesses," the Legislature has enacted detailed legislation extensively regulating the administration of ECT, and requiring, among other things, stringent safeguards designed to insure that psychiatric patients have the right to refuse ECT. (Welf. & Inst. Code, §§ 5325, subd. (f), 5325.1-5326.5, 5326.7-5327.) The procedural safeguards enacted by the Legislature include requiring a patient's voluntary written informed consent to the use of ECT; the voluntary written informed consent of a responsible relative, guardian or conservator of a patient who does not have the capacity to give written informed consent; and a noticed evidentiary hearing in superior court to determine a patient's capacity to give written consent whenever either the attending physician or the patient's attorney believes that the patient does not have such capacity. (Welf. & Inst. Code, § 5326.7, subds. (d), (e), (f), (g) and (h).)[1] These regulatory provisions are contained within the Lanterman-Petris-Short Act (the LPS Act). According to its express statement of purpose, the LPS Act was enacted to protect the rights of mentally disturbed persons; to promote prompt individualized evaluation, treatment, supervision and placement of the seriously mentally ill; and "[t]o end the inappropriate, indefinite, and involuntary commitment of mentally disordered persons, developmentally disabled persons, and persons impaired by chronic alcoholism, and to eliminate legal disabilities; . . ." (Welf. & Inst. Code, §§ 5000, 5001.)

### III

On appeal, the City of Berkeley urges that the trial court erred in granting summary judgment because both of the grounds upon which the court based its grant of the motion allegedly involved triable issues of material fact precluding summary judgment. (Code Civ. Proc., § 437c.) We disagree.

■ The two issues argued by respondents in support of their motion for summary judgment, and on the basis of which the trial court granted that motion, were the preemption of the municipal ordinance by preexisting state law and the constitutionality of the ordinance. The resolution of both of

---

[1]In *Lillian F.* v. *Superior Court, supra,* 160 Cal.App.3d 314, the First Division of this court held that the standard of proof in the statutory noticed hearing on the question of whether a patient lacks the capacity to consent to or refuse convulsive treatment must be that of clear and convincing evidence, rather than the "preponderance of evidence" standard. (*Id.,* at pp. 320-324.)

these issues turns entirely on questions of law for which the summary judgment procedure is appropriate. (*Killian* v. *City and County of San Francisco* (1978) 77 Cal.App.3d 1, 7 [143 Cal.Rptr. 430].)

■ Article XI of the California Constitution deals with local government. Section 5 provides that chartered cities "may make and enforce all ordinances and regulations *in respect to municipal affairs,* subject only to restrictions and limitations provided in their several charters and *in respect to other matters they shall be subject to general laws.*" (Cal. Const., art. XI, § 5, subd. (a), italics added.) Similarly, section 7 states: "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations *not in conflict with general laws.*" (*Id.,* § 7, italics added.) ■ " 'Local legislation in conflict with general law is void. Conflicts exist if the ordinance duplicates [citations], contradicts [citation], or enters an area fully occupied by general law, either expressly or by legislative implication [citations]. If the subject matter or field of the legislation has been fully occupied by the state, there is no room for supplementary or complementary local legislation, even if the subject were otherwise one properly characterized as a "municipal affair." [Citations.]' [Citation.]" (*People* ex rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476, 484-485 [204 Cal.Rptr. 897, 683 P.2d 1150]; see also *Ventura* v. *City of San Jose* (1984) 151 Cal.App.3d 1076, 1078 [199 Cal.Rptr. 216].)

In short, if Ordinance 5504 does not deal strictly with "municipal affairs," it is a matter "subject to general [state] laws," and must be declared unconstitutional and preempted either if it contradicts state law or if it enters a field fully occupied by state law. (*People* ex rel. *Deukmejian* v. *County of Mendocino, supra,* 36 Cal.3d at pp. 484-485; *Lancaster* v. *Municipal Court* (1972) 6 Cal.3d 805, 807-808 [100 Cal.Rptr. 609, 494 P.2d 681]; *Doe* v. *City and County of San Francisco* (1982) 136 Cal.App.3d 509, 512 [186 Cal.Rptr. 380].) This issue is one of law, not of fact.

IV

■ The threshold question is whether Berkeley's ordinance banning ECT is peculiarly "municipal" in nature. Because article XI of the state Constitution fails to define municipal affairs, it is necessary for the courts to decide, as a matter of law on a case-by-case basis, whether the subject matter of a municipal ordinance in question is of local or statewide concern. (*Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d 276, 294 [32 Cal.Rptr. 830, 384 P.2d 158].) ■ "A city has no power to legislate upon matters which are not of a local nature [citations]. When

there is a doubt as to whether an attempted regulation relates to a municipal or to a state matter, or if it be the mixed concern of both, the doubt must be resolved in favor of the legislative authority of the state [citations]." (*Abbott* v. *City of Los Angeles* (1960) 53 Cal.2d 674, 681 [3 Cal.Rptr. 158, 349 P.2d 974, 82 A.L.R.2d 385].)

Berkeley asserts that its enactment of Ordinance 5504 was a valid and reasonable exercise of its police power, in furtherance of such local municipal concerns as Berkeley's "distinctive life style," "pioneering role in accepting new standards," "sensitivity to the problems of disenfranchised groups in the society," and "commitment to expanding the human rights of all groups that face discrimination, stereotyping, negative cultural bias and other limitations to full personal development." Aside from the arguably ephemeral or tangential connection between these concerns and the subject matter and content of the ordinance in question, Berkeley's contention presupposes either that these interests are not shared by the state as a whole or that they are best addressed at the local level. We do not agree with this presupposition.

The principle was well stated in the case of *Robins* v. *County of Los Angeles* (1966) 248 Cal.App.2d 1 [56 Cal.Rptr. 853]. ■ "The significant issue in determining whether local regulation should be permitted depends upon a 'balancing of two conflicting interests: (1) the needs of local governments to meet the special needs of their communities; and (2) the need for uniform state regulation.' [Citation.] . . . [¶] That basic issue, in turn, may in a specific instance be fragmented into the component issues which combine to effect its resolution such as whether local legislators are more aware of and better able to regulate appropriately the problems of their areas, whether substantial geographic, economic, ecological or other distinctions are persuasive of the need for local control, and whether local needs have been adequately recognized and comprehensively dealt with at the state level. Certain areas of human behavior command statewide uniformity, especially the regulation of statewide commercial activities and the conduct of transient individuals, so that mobility may not be burdened unreasonably. Finally, it should be considered whether the nature of the subject matter of the local ordinance is such that those affected might reasonably be expected to inquire about existing ordinances in planning their activities. ■ As a general rule it may be said that ordinances affecting the local use of static property might reasonably prevail, while ordinances purporting to proscribe social behavior of individuals should normally be held invalid if state statutes cover the areas of principal concern with reasonable adequacy." (*Id.*, at pp. 9-10.)

■ Berkeley has failed to enunciate a valid interest of a strictly local or municipal nature which could outweigh the state's legitimate interest in regulating the field of psychiatric treatment in general and ECT in particular. Local legislators are not inherently "more aware of and better able to regulate appropriately" the psychiatric profession and the treatments used thereby. There are no "geographic, economic, ecological or other distinctions" in this case which are "persuasive of the need for local control." Local needs and concerns in this area have been specifically addressed by legislation at the state level.[2] Finally, the regulation of the psychiatric profession and of psychiatric treatment requires statewide uniformity rather than fragmented localization.

■ We conclude that there is simply nothing about the administration of ECT which makes it a purely local or "municipal affair." Resolving doubts as to whether Berkeley's attempted ban on ECT relates to a municipal or a state matter in favor of the legislative authority of the state, as we must (*Abbott* v. *City of Los Angeles, supra,* 53 Cal.2d at p. 681), we find that it is a matter of statewide concern. Under article XI of the state Constitution, therefore, Berkeley is subject to "general laws" in this matter, and the ordinance must be found void if it duplicates, conflicts with, or simply enters an area already fully occupied by general state law, either expressly or by implication. (*People* ex rel. *Deukmejian* v. *County of Mendocino, supra,* 36 Cal.3d at p. 484; *Younger* v. *Berkeley City Council* (1975) 45 Cal.App.3d 825, at p. 830 [119 Cal.Rptr. 830].)

V

■ Sections 5325 through 5331 of the Welfare and Institutions Code define the legal and civil rights of the mentally ill. Section 5325 provides, in pertinent part: "Each person involuntarily detained for evaluation or treatment under provisions of this part, each person admitted as a voluntary patient for psychiatric evaluation or treatment to any health facility . . . in

---

[2]See, for example, the following sections of the Welfare and Institutions Code, all from the LPS Act itself: sections 5115 and 5116 (legislatively declared statewide policy that mentally disordered or otherwise handicapped persons are entitled to live in normal residential surroundings; use of property for the care of no more than six such persons declared a "residential use" of property for all zoning purposes); section 5120 (legislatively declared statewide policy that care and treatment of mental patients be provided in the local community; cities and counties may not exclude facilities for psychiatric care and must permit such facilities in any area zoned for hospitals or nursing homes); section 5155 (local entities not granted any authority "to issue licenses supplementary to existing state and local licensing laws"); and sections 5450-5459 (legislatively established community residential treatment system in every county as alternatives to institutional care, flexibly designed to meet specific "nature of the community and the needs of the clients" and "to coordinate with current elements of local agencies").

which psychiatric evaluation or treatment is offered, and each mentally re-tarded person committed to a state hospital . . . shall have the following rights . . .: [¶] (f) To refuse convulsive treatment including, but not limited to, any electroconvulsive treatment, any treatment of the mental condition which depends on the induction of a convulsion by any means, and insulin coma treatment."

Section 5325.1, in turn, states in relevant part: "Persons with mental illness have the same legal rights and responsibilities guaranteed all other persons by the federal Constitution and laws and the Constitution and laws of the State of California *unless specifically limited by federal or state law or regulations.* . . . [¶] It is the intent of the Legislature that *persons with mental illness shall have rights including, but not limited to, the following:* [¶] (a) *A right to treatment services which promote the potential of the person to function independently.* Treatment should be provided in ways that are least restrictive of the personal liberty of the individual." (Italics added.)

Sections 5326.7 and 5326.75 deal specifically with convulsive treatment, providing that such treatment "may be administered" to either voluntary or involuntary patients "only if" certain strict conditions are met: most im-portantly, the requirement of written informed consent.

Finally, section 5326.8 deals with the administration of convulsive treat-ment to minors. In pertinent part, it provides: "Under no circumstances shall convulsive treatment be performed on a minor under 12 years of age. Persons 16 and 17 years of age shall personally have and exercise the rights under this article. [¶] Persons 12 years of age and over, and under 16, may be administered convulsive treatment only if all the other provisions of this law are complied with and in addition: [¶] (a) *It is an emergency situation and convulsive treatment is deemed a lifesaving treatment.* [¶] (b) This fact and *the need for and appropriateness of the treatment are unanimously cer-tified to by a review board* of three board-eligible or board-certified child psychiatrists appointed by the local mental health director. [¶] (c) It is oth-erwise performed in full compliance with regulations promulgated by the Director of Mental Health . . . . [¶] (d) It is thoroughly documented and reported immediately to the Director of Mental Health." (Italics added.)

The language of these statutes, while limiting and carefully regulating the administration of ECT and other convulsive therapies in order to protect the rights of patients, appears to indicate an intent on the part of the Legislature that ECT remain as an available option for psychiatric treatment. Indeed, the Legislature has expressly recognized that ECT may be "a lifesaving

treatment" in certain instances. ■■■ By enacting an outright, uncondi-tional ban on the administration of ECT within its own borders, Berkeley has created an apparent conflict with the state legislative statutory scheme and its guarantee to all mentally ill persons of a "right to treatment services which promote the potential of the person to function independently." (Welf. & Inst. Code, § 5325.1, subd. (a).)

■■■ This conclusion is supported by the history of the provisions of the LPS Act dealing with ECT. Originally enacted in 1967, and operative July 1, 1969 (Stats. 1967, ch. 1667, § 36, p. 4074), the LPS was subsequently amended several times. Section 5326.4, added in 1974, originally set forth detailed restrictions on the administration of ECT. (Stats. 1974, ch. 1534, § 4, p. 3462.) Among these restrictions was a requirement that *any* use of ECT be preceded by the unanimous consent of a review committee of three physicians. (Former Welf. & Inst. Code, § 5326.4, subd. (8)(e), added by Stats. 1974, ch. 1534, § 4, p. 3462, amended by Stats. 1976, ch. 1109, § 5, p. 4995.)

In the case of *Aden v. Younger* (1976) 57 Cal.App.3d 662 [129 Cal.Rptr. 535], the Court of Appeal found this provision unconstitutional as applied to voluntary, competent patients who have given informed voluntary consent to the use of ECT. "Freedom of thought is intimately touched upon by any regulation of procedures affecting thought and feelings. In an effort to pro-tect freedom of thought, the state has put procedural and substantive obsta-cles in the path of those who both need and desire certain forms of treat-ment, and in that way their freedom of thought remains impaired because they cannot get treatment. The means of alleviating mental disorders gen-erate their own kinds of fear and misunderstanding. This attitude touches our public affairs; the fact of treatment alone may impair our confidence in people of unquestioned talent and industry. Psychosurgery and (ECT) [*sic*] are viewed, rightly or wrongly, as drastic, radical forms of treatment com-pared to psychotherapy or drug therapy, and indicative of more severe ill-ness. Public exposure, or even disclosure to limited numbers of government representatives, may have a chilling effect on patients' efforts to undergo these treatments, thereby restricting their freedom of thought. *Some patients will be denied treatment as a natural and intended result of this legislation. Although the reasons for such denials may be the patients' own best inter-ests, such regulation must be justified by a compelling state interest.* . . .

" . · . · . · . · . · . · . · . · . · . · . · . · . · .

"The thorny question in section 5326.4 concerns the application of the review system to voluntary, competent patients. . . . [T]he state has a com-

pelling interest in assuring the competency and voluntariness of patients who undergo this form of treatment [ECT]. To this end, the review system is compatible with due process. *However, once the competency of a voluntary patient has been confirmed, and the truly voluntary nature of his consent is determined, the state has little excuse to invoke the substitute decision-making process.* 'Shock treatment,' or more precisely ECT, is not an experimental procedure, nor are its hazards as serious as those of psychosurgery. . . . *Where informed consent is adequately insured, there is no justification for infringing upon the patient's right to privacy in selecting and consenting to the treatment. The state has varied interests which are served by the regulation of ECT, but these interests are not served where the patient and his physician are the best judges of the patient's health, safety and welfare."* (*Aden* v. *Younger, supra,* 57 Cal.App.3d at pp. 680, 684, italics added.)

As a result of this decision, the Legislature amended the provisions of the LPS Act dealing with the administration of ECT. Among other things, the Legislature added section 5325.1 guaranteeing a mentally ill patient's "right to treatment services" (Stats. 1978, ch. 1320, § 1, p. 4319); section 5326.2 defining "voluntary informed consent" (Stats. 1976, ch. 1109, § 3.5, p. 4994); section 5326.7 setting conditions for the administration of convulsive treatment to involuntary patients (Stats. 1976, ch. 1109, § 8, p. 4997); section 5326.75 establishing conditions for administration of convulsive treatment to voluntary patients (Stats. 1976, ch. 1109, § 8.5, p. 4998); and section 5326.8, the provision dealing with administration of convulsive treatment to minors (Stats. 1976, ch. 1109, § 9, p. 4998, amended by Stats. 1977, ch. 1252, § 566, p. 4572, operative July 1, 1978). Moreover, the Legislature expressly stated that it was doing so in recognition of "the danger of a violation of a mental patient's constitutional right to privacy," and that it intended "to assure that the integrity and free choice of every such patient is fully recognized and protected." (Stats. 1976, ch. 1109, § 1, p. 4992.)

 The Berkeley ordinance is an outright ban on a particular kind of psychiatric treatment, which, although controversial, is recognized by the psychiatric and medical communities as being useful under certain circumstances. (*Aden* v. *Younger, supra,* 57 Cal.App.3d at p. 672.) Berkeley Ordinance 5504, by criminalizing the use of ECT in all cases, clearly infringes on the free choice of psychiatric patients who voluntarily and competently elect ECT, contrary to the express intent of the Legislature that "the integrity and *free choice* of every such patient [be] *fully recognized and protected."* (Stats. 1976, ch. 1109, § 1, p. 4992, italics added.)

In light of this legislative history and the decision in *Aden* v. *Younger, supra,* 57 Cal.App.3d 662, we conclude that the total ban on ECT contained

in Berkeley's Ordinance 5504 is in direct conflict with the Legislature's intention both that ECT be available in cases which meet the stringent regulations adopted, and that the free choice of every psychiatric patient to take or not take ECT be protected.

## VI

■ Even if this direct conflict with existing state legislation did not exist, the Berkeley ordinance would still be unconstitutional as an unwarranted local infringement on a matter of exclusive statewide concern, to the extent that it enters an area fully occupied or preempted by general state law. We therefore turn to the state statutory scheme to determine whether Ordinance 5504 deals with a subject that has been preempted by state law.

The principle of preemption is not limited in its application to situations where the Legislature has enacted statutes containing express language barring all local legislation or regulation supplementary thereto. A municipal ordinance on a given subject is barred "when the entire field, that is the subject matter of the ordinance, has already been fully occupied by the state. Thus the Constitution prohibits a city from imposing additional requirements in a state occupied field [citations] . . . ." (*Abbott* v. *City of Los Angeles, supra,* 53 Cal.2d at p. 682.)

On the other hand, the fact that the state has legislated on the same subject does not necessarily exclude the municipal power. A municipality may make additional regulations, different from those established by the state, if not inconsistent with the purpose of the general law. (*Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 704-709 [209 Cal.Rptr. 682, 693 P.2d 261].) ■ In general, municipal power is lost where the Legislature has manifested an intention expressly or by implication wholly to occupy the field, so that any local regulations will necessarily be inconsistent with state law. (5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 445, p. 3743.) In deciding whether the state has "occupied the field," however, we must consider not only the abstract legislative intent in enacting relevant statutes or whether the Legislature has created an extensive regulatory scheme disclosing an implied purpose to exclude all local regulation, but also whether the subject matter at issue is one of exclusive statewide concern as to which as a matter of public policy there is no room for municipal regulation. (5 Witkin, *op. cit. supra,* Constitutional Law, §§ 445, 452, pp. 3743-3744, 3749-3751.)[3] In short, if the subject matter is one of general or statewide

---

[3]"[T]here are innumerable authorities holding that general law prevails over local enactments of a chartered city, even in regard to matters which would otherwise be deemed to be strictly municipal affairs, where the subject matter of the general law is of statewide concern." (*Professional Fire Fighters, Inc.* v. *City of Los Angeles, supra,* 60 Cal.2d at p. 292.)

concern, the Legislature has paramount authority; and if the Legislature has enacted general legislation covering that matter, in whole or in part, there must be a presumption that the matter has been preempted. (*Baron* v. *Los Angeles* (1970) 2 Cal.3d 535, 539-541 [86 Cal.Rptr. 673, 469 P.2d 353, 42 A.L.R.3d 1036]; *Younger* v. *Berkeley City Council, supra,* 45 Cal.App.3d at pp. 829-831.)[4]

██ "Although the adoption of local rules supplementary to state law is proper under some circumstances, it is well settled that local regulation is invalid if it attempts to impose additional requirements in a field which is fully occupied by statute. [Citations.] Determination of the question whether the Legislature has undertaken to occupy exclusively a given field of legislation depends upon an analysis of the statute and a consideration of the facts and circumstances upon which it was intended to operate. [Citations.] Where the Legislature has adopted statutes governing a particular subject matter, its intent with regard to occupying the field to the exclusion of all local regulation is not to be measured alone by the language used but by the whole purpose and scope of the legislative scheme. [Citations.]" (*Tolman* v. *Underhill* (1952) 39 Cal.2d 708, 712 [249 P.2d 280].) ██ "The test for determining whether the area is fully occupied on the basis of legislative implication was established in *In re Hubbard* [1964] 62 Cal.2d 119, 128 [41 Cal.Rptr. 393, 396 P.2d 809]. In determining whether the Legislature has preempted by implication to the exclusion of local regulation we must look to the whole purpose and scope of the legislative scheme. There are three tests: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality.' [Citations.]" ██ ██ (*People* ex rel. *Deukmejian* v. *County of Mendocino, supra,* 36 Cal.3d at p. 485; accord, *Fisher* v. *City of Berkeley, supra,* 37 Cal.3d at pp. 707-708; see also *Galvan* v. *Superior Court* (1969) 70 Cal.2d 851, 859-860 [76 Cal.Rptr. 642, 452 P.2d 930].)[5]

---

[4]This presumption is of course rebuttable. Thus, for example, if the statewide legislation in question makes clear an intent to permit municipalities to enact local ordinances supplementary to statewide general law, there is no preemption. (Cf. *Ventura* v. *City of San Jose, supra,* 151 Cal.App.3d at pp. 1078-1082; *County of Santa Barbara* v. *City of Santa Barbara* (1976) 59 Cal.App.3d 364, 370-371 [130 Cal.Rptr. 615].)

[5]Thus, it is well established that where the state has provided a comprehensive scheme for examining and licensing members of a trade or profession, municipalities may not im-

 The Legislature has recognized that matters of health and medicine, including psychiatry, are of statewide concern. Among the numerous aspects of health care comprehensively regulated by state statute are: the licensing of professional medical practitioners (Medical Practices Act, Bus. & Prof. Code, § 2000 et seq.); the treatment of children (Health & Saf. Code, §§ 289 et seq.; 300 et seq.; 360 et seq.); treatment of genetically handicapped persons (Health & Saf. Code, § 341); intensive care for newborn children (Health & Saf. Code, § 275); medical reporting requirements (Health & Saf. Code, §§ 410, 3125, 13110.7; Lab. Code, § 6409); confidentiality of medical records and information (Health & Saf. Code, § 25250 et seq.; Civ. Code, § 56 et seq.); emergency medicine (Health & Saf. Code, § 1797.100 et seq.); and the availability and administration of medical treatment and drugs (Health & Saf. Code, §§ 417 et seq.; 423 et seq.; 1700 et seq.; 11000 et seq.; 24170 et seq.).

 The availability and administration of psychiatric care and services are regulated not only by the LPS Act (Welf. & Inst. Code, § 5000 et seq.), but by numerous other state statutes. (See, for example, Welf. & Inst. Code, §§ 5600 et seq. [Short-Doyle Act, for organization, financing and regulation of community mental health facilities and services]; 6000 et seq.; [regulation of voluntary admissions to mental hospital and institutions] 7100 et seq. [regulation of state and county psychiatric hospitals].) These statutes manifest a clear legislative intent to occupy the field of psychiatric care, treatment, services and facilities in general. In our view, the fact that the LPS Act actually regulates ECT itself, and specifically authorizes the administration of ECT when procedural requisites are satisfied, confirms the fact that the field sought to be "regulated" by Berkeley—if, indeed, outright abolition can be called "regulation"—has been fully occupied and preempted by general state law. (Cf. *Ventura v. City of San Jose, supra,* 151 Cal.App.3d at pp. 1078-1082.)

In view of our conclusion, we need not address respondents' argument that Ordinance 5504 is in violation of the right of privacy under both the federal and state constitutions.

---

pose additional qualifications before issuing licenses to exercise the trade or profession within the city. (*Baron v. City of Los Angeles, supra,* 2 Cal.3d at pp. 540-541 [ordinance regulating local lobbying cannot apply to acts of attorney constituting practice of law]; *Verner, Hilby & Dunn v. City of Monte Sereno* (1966) 245 Cal.App.2d 29, 34-35 [53 Cal.Rptr. 592] [local ordinance regulating civil engineers and surveyors conflicted with Bus. & Prof. Code, § 6700 et seq.]; *Robillwayne Corp. v. City of Los Angeles* (1966) 241 Cal.App.2d 57, 62 [50 Cal.Rptr. 1] [local ordinance licensing fire insurance adjusters in conflict with Bus. & Prof. Code, § 7520 et seq.]; *Agnew v. City of Los Angeles* (1952) 110 Cal.App.2d 612, 615 [243 P.2d 73] [local fee and bond for electrical contractors void]; *San Francisco v. Boss* (1948) 83 Cal.App.2d 445, 448-450 [189 P.2d 32] [local licensing requirements for contractors void]; *Horwith v. City of Fresno* (1946) 74 Cal.App.2d 443, 447 [168 P.2d 767] [municipal examination requirement for electrical contractors void].)

## VII

We turn to the appeal of the Coalition from the trial court's denial of its motion to intervene.

The Coalition's attempt to intervene in the underlying lawsuit was not made until after the summary judgment motion had been fully briefed and argued, and the trial court had indicated its intent to grant the motion. There was no excuse for the tardiness of this application for intervention, since the Coalition had been involved in the lawsuit from the outset, and had filed an amicus brief in support of the City of Berkeley in January 1983, six months before the motion for summary judgment was filed and heard. Under the Code of Civil Procedure, intervention must be sought "upon timely application," whether the intervention being sought is as of right or merely permissive. (Code Civ. Proc., § 387, subds. (a) and (b).) Timeliness is therefore one of the prerequisites for granting an application to intervene. (*Allen* v. *California Water and Tel. Co.* (1947) 31 Cal.2d 104, 108 [187 P.2d 393]; *Sanders* v. *Pacific Gas & Elec. Co.* (1975) 53 Cal.App.3d 661, 668 [126 Cal.Rptr. 415].)

The determination of whether the standards for intervention have been met is left to the sound discretion of the trial court. (*Fireman's Fund Ins. Co.* v. *Gerlach* (1976) 56 Cal.App.3d 299, 302 [128 Cal.Rptr. 396]; *Beshara* v. *Goldberg* (1963) 221 Cal.App.2d 392, 396 [34 Cal.Rptr. 501].) "It is settled that any unreasonable delay in filing a petition for leave to intervene is a sufficient ground for a denial of the petition." (*In re Yokohama Specie Bank* (1948) 86 Cal.App.2d 545, 554-555 [195 P.2d 555].) We conclude that the trial court committed no abuse of discretion in denying the Coalition's application to intervene in this case.

The judgment is affirmed.

Scott, J., and Merrill, J., concurred.

The petition of defendant and appellant for review by the Supreme Court was denied May 22, 1986. Bird, C. J., was of the opinion that the petition should be granted.