# IN THE SUPREME COURT OF CALIFORNIA

CHEVRON U.S.A. INC. et al.,
Plaintiffs and Respondents,
v.
COUNTY OF MONTEREY,
Defendant;
PROTECT MONTEREY COUNTY et al.,
Interveners and Appellants.

S271869

Sixth Appellate District
H045791

Monterey County Superior Court
16CV003978

August 3, 2023

Justice Jenkins authored the opinion of the Court, in which
Chief Justice Guerrero and Justices Liu, Kruger, Groban,
Evans, and Raphael* concurred.

---

\* Associate Justice of the Court of Appeal, Fourth
Appellate District, Division Two, assigned by the Chief Justice
pursuant to article VI, section 6 of the California Constitution.

CHEVRON U.S.A. INC. v. COUNTY OF MONTEREY

S271869

Opinion of the Court by Jenkins, J.

In 2016, Protect Monterey County (PMC) sponsored, and Monterey County (County) voters passed, "Measure Z," a local ordinance that bans oil and gas wastewater injection and impoundment and the drilling of new oil and gas wells throughout the County's unincorporated areas. Chevron U.S.A. Inc. (Chevron) and other oil producers and mineral rights holders, among others (collectively, plaintiffs), filed a total of six actions[1] against the County challenging Measure Z on various grounds, including state and federal preemption. PMC and its founder and spokesperson, Dr. Laura Solorio (hereinafter collectively, PMC), intervened in the action. The trial court entered judgment in favor of plaintiffs on state and federal preemption grounds. PMC appealed, and the Court of Appeal affirmed. (*Chevron U.S.A., Inc. v. County of Monterey* (2021) 70 Cal.App.5th 153 (*Chevron*).)

---

[1] The actions were brought by: (1) Chevron, San Ardo Union Elementary School District, business owners, and individual royalty owners, which we will collectively refer to as Chevron; (2) Aera Energy LLC; (3) California Resources Corporation; (4) National Association of Royalty Owners-California, Inc. and various individuals and entities; (5) Eagle Petroleum LLC; and (6) Trio Petroleum LLC and other corporations. The trial court consolidated the six actions for purposes of a Phase I trial in which it resolved what it described as "Constitutional and pre-emption challenges" and "purely legal" challenges to Measure Z, including claims of preemption and facial takings.

1

We granted review to decide whether Public Resources Code section 3106[2] preempts Measure Z. We conclude it does because Measure Z is contradictory to, and therefore conflicts with, section 3106. Accordingly, we affirm the judgment of the Court of Appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

The County's oil fields are in the County's inland regions and operate under permits issued by the County and Geologic Energy Management Division (CalGEM),[3] the state agency tasked with overseeing the state's drilling, operation, maintenance, and plugging and abandonment of oil and gas wells. (§§ 3002, 3100 et seq., 3106, subd. (a).) Because of the oil deposits' viscous nature, oil is extracted using steam injection, whereby new wells are drilled and steam is injected underground to heat the oil and make it more fluid so that it can be pumped out of the ground.[4]

Measure Z was a County initiative entitled "Protect Our Water: Ban Fracking and Limit Risky Oil Operations Initiative." It was sponsored by PMC and its stated purpose was to protect the County's "water, agricultural lands, air quality, scenic vistas, and quality of life." It passed with 56 percent of

---

[2] All further undesignated statutory references are to the Public Resources Code.

[3] CalGEM is a division of the Department of Conservation and is led by the "State Oil and Gas Supervisor." (§§ 3001, 3002, 3004.) Before January 1, 2020, CalGEM was known as the Division of Oil, Gas, and Geothermal Resources, DOGGR. (Stats. 2019, ch. 771, § 8.)

[4] We set forth these basic background facts relating to oil production in the County in order to elucidate the meaning and effect of Measure Z.

the vote. The measure applies exclusively to oil and gas operations and contains three prohibitions that apply to the County's unincorporated areas. The first — LU-1.21 — bans well stimulation treatments including hydraulic fracturing (commonly known as fracking) and is not at issue here because none of the plaintiffs use, or have any plans to use, such methods.[5]

The second — LU-1.22 — provides, "Prohibited Land Uses: The development, construction, installation, or use of any facility, appurtenance, or above-ground equipment, whether temporary or permanent, mobile or fixed, accessory or principal, in support of oil and gas wastewater injection or oil and gas wastewater impoundment is prohibited on all lands within the County's unincorporated area." For purposes of LU-1.22, " 'oil and gas wastewater injection' " means "the injection of oil and gas wastewater into a well for underground storage or disposal"; " 'oil and gas wastewater impoundment' " means "the storage or disposal of oil and gas wastewater in depressions or basins in the ground, whether manmade or natural, lined or unlined, including percolation ponds and evaporation ponds"; and " 'oil and gas wastewater' " means "wastewater brought to the surface in connection with oil or natural gas production, including flowback fluid and produced water."

The third prohibition — LU-1.23 — provides, "Prohibited Land Uses: The drilling of new oil and gas wells is prohibited on all lands within the County's unincorporated area. This . . . does not affect oil and gas wells drilled prior to the Effective

---

[5] For simplicity, we will at times refer to LU-1.22 and LU-1.23 together as Measure Z, even though Measure Z also includes LU-1.21, which is not at issue in this appeal.

Date and which have not been abandoned." For purposes of this prohibition, " 'oil and gas wells' " are "wells drilled for the purpose of exploring for, recovering, or aiding in the recovery of, oil and gas."

On December 14, 2016 — two days before Measure Z was scheduled to take effect — plaintiffs filed against the County petitions for writ of mandate and complaints for declaratory and injunctive relief and inverse condemnation, claiming Measure Z was preempted by state and federal law, constituted a facial taking of their property, and violated their due process rights. Some of the plaintiffs also claimed that Measure Z was vague, created inconsistencies within the County's general plan, and violated the single-subject rule for local ordinances because, among other things, it was misleadingly promoted to voters as an anti-fracking initiative even though no fracking was occurring in the County. The County stipulated to an indefinite stay of Measure Z's implementation.

PMC intervened in the actions. After a bench trial, the trial court dismissed plaintiffs' action as to LU-1.21 on ripeness and standing grounds because no petitioner was using or proposing to use the fracking process LU-1.21 banned. Plaintiffs did not challenge that decision. Regarding LU-1.22 and LU-1.23, the court found them preempted by section 3106 and the federal Safe Drinking Water Act (42 U.S.C. § 300f et. seq.). As to state preemption, the court determined that Measure Z is "contradictory" to section 3106, that the "state oil and gas regulatory scheme fully occupies the area of the manner of oil and gas production," and that Measure Z "seeks to regulate the manner of oil and gas production by restricting particular oil production techniques, namely wastewater injection and

impoundment" and the drilling of new oil wells. The court rejected PMC's characterization of Measure Z as a "land use" ordinance entitled to a strong presumption against preemption, stating that the measure's "prohibition on certain 'land uses' is clearly a pretextual attempt to do indirectly what [the County] cannot do directly," i.e., ban certain methods of oil production in a way that will bring oil production in the County "to a complete halt in five years or less." The court issued a writ of mandate directing the County to invalidate LU-1.22 and LU-1.23.

PMC and the County appealed. The County abandoned its appeal shortly thereafter and has not defended Measure Z on appeal. The Court of Appeal affirmed on state preemption grounds. (*Chevron*, *supra*, 70 Cal.App.5th 153.)

## DISCUSSION

Article XI, section 7 of the California Constitution provides that a "county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." " 'If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void.' " (*Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897 (*Sherwin-Williams*), quoting *Candid Enterprises, Inc. v. Grossmont Union High School Dist.* (1985) 39 Cal.3d 878, 885.)

In *Sherwin-Williams*, we identified three ways in which a preempting conflict may arise: " 'if the local legislation " 'duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication.' " ' " (*Sherwin-Williams*, *supra*, 4 Cal.4th at p. 897.) First, "[l]ocal legislation is 'duplicative' of general law when it is coextensive therewith." (*Ibid.*) Second, it is " 'contradictory' to general law

when it is inimical thereto." (*Id*. at p. 898.) Third, it "enters an area that is 'fully occupied' by general law when the Legislature has expressly manifested its intent to 'fully occupy' the area [citation], or when it has impliedly done so in light of one of the following indicia of intent: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the' locality." (*Ibid*.)

The party alleging preemption "has the burden of demonstrating" it. (*Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1149 (*Big Creek Lumber*).) "Whether state law preempts a local ordinance is a question of law that is subject to de novo review." (*Roble Vista Associates v. Bacon* (2002) 97 Cal.App.4th 335, 339.)

California's oil and gas operations are governed by Division 3 of the Public Resources Code (§ 3000 et seq.) and its implementing regulations (Cal. Code Regs., tit. 14, § 1712 et seq.). Division 3 addresses various aspects of oil and gas exploration and extraction, including notices of intent to drill and abandon (§§ 3203, 3229), blowout prevention (§ 3219), repairs (§ 3225), protection of water supplies (§§ 3222, 3228), and well spacing (§§ 3600–3609). The implementing regulations, in turn, address the process for oil producers and well operators to obtain state approval of "drilling, reworking,

injection, plugging, or plugging and abandonment operations" (Cal. Code Regs., tit. 14, § 1714) and provides instructions and timelines for filing well and safety records with CalGEM (*id.* at § 1724.1). The regulations are "statewide in application for onshore drilling, production, and injection operations," and "[a]ll onshore prospect, development, and service wells shall be drilled and operated in accordance with" them. (*Id.* at § 1712.)

Subdivision (a) of the statute here at issue — section 3106 — provides: "The [state oil and gas] supervisor shall so supervise the drilling, operation, maintenance, and abandonment of wells and the operation, maintenance, and removal or abandonment of tanks and facilities attendant to oil and gas production . . . so as to prevent, as far as possible, damage to life, health, property, and natural resources; damage to underground oil and gas deposits from infiltrating water and other causes; loss of oil, gas, or reservoir energy, and damage to underground and surface waters suitable for irrigation or domestic purposes by the infiltration of, or the addition of, detrimental substances."

Subdivision (b) of section 3106 provides that the supervisor "shall also supervise the drilling, operation, maintenance, and abandonment of wells so as to permit the owners or operators of the wells to utilize all methods and practices known to the oil industry for the purpose of increasing the ultimate recovery of underground hydrocarbons and which, in the opinion of the supervisor, are suitable for this purpose in each proposed case. To further the elimination of waste by increasing the recovery of underground hydrocarbons, it is hereby declared as a policy of this state that the grant in an oil and gas lease or contract to a lessee or operator of the right or

power, in substance, to explore for and remove all hydrocarbons from any lands in the state, in the absence of an express provision to the contrary contained in the lease or contract, is deemed to allow the lessee or contractor, or the lessee's or contractor's successors or assigns, to do what a prudent operator using reasonable diligence would do, having in mind the best interests of the lessor, lessee, and the state in producing and removing hydrocarbons, including, but not limited to, the injection of air, gas, water, or other fluids into the productive strata, the application of pressure heat or other means for the reduction of viscosity of the hydrocarbons, the supplying of additional motive force, or the creating of enlarged or new channels for the underground movement of hydrocarbons into production wells, when these methods or processes employed have been approved by the supervisor, except that nothing contained in this section imposes a legal duty upon the lessee or contractor, or the lessee's or contractor's successors or assigns, to conduct these operations."

The Legislature passed section 3106 in 1939, at the same time it enacted the Public Resources Code and created CalGEM. (Stats. 1939, ch. 93, § 3106, p. 1112.) As originally enacted, section 3106 required the supervisor "to prevent, as far as possible, damage to underground oil and gas deposits from infiltrating water and other causes, loss of oil and gas, and damage to underground and surface waters suitable for irrigation or domestic purposes by the infiltration of, or the addition of, detrimental substances, by reason of the drilling, operation, maintenance, or abandonment of wells." (Stats. 1939, ch. 93, § 3106, p. 1112.) In 1961, the Legislature added subdivision (b) of section 3106, which read then essentially as it reads today and clarified that in order to eliminate waste and

increase recovery, oil leases and contracts that are silent about oil production methods and practices would be "deemed" to allow all practices approved by the supervisor. (Stats. 1961, ch. 2074, § 1.)

In 1970, the Legislature amended subdivision (a) of section 3106 to require the supervisor to "prevent, as far as possible, damage to life, health, property, and natural resources . . . ." (Stats. 1970, ch. 799, § 1.) Two years later, the Legislature added subdivision (d) of section 3106, which provides: "To best meet oil and gas needs in this state, the supervisor shall administer this division so as to encourage the wise development of oil and gas resources." (Stats. 1972, ch. 898, § 7; see Resources Agency, Enrolled Bill Rep. on Sen. Bill No. 1022 (1972 Reg. Sess.) August 11, 1972 [the 1972 amendment was meant to "strengthen the role" of the supervisor in overseeing oil and gas production].) As a result of these amendments, the current version of the statute directs the supervisor to administer the state's regulations in a way that serves the dual purpose of ensuring the state has adequate oil and gas resources, while protecting the environment. (§ 3106, subds. (a), (b), (d).)

Plaintiffs argue — as the trial court and the Court of Appeal determined — that Measure Z's ban on "[r]isky [o]il [o]perations" — i.e., wastewater injection and impoundment and the drilling of new oil wells — contradicts section 3106, subdivision (b). As earlier noted, preemption based on contradiction applies when the local law is "inimical" to state law. (*Sherwin-Williams*, *supra*, 4 Cal.4th at p. 898.) We have also stated that local law is preempted as "contradictory" when it "cannot be reconciled with state law." (*O'Connell v. City of*

*Stockton* (2007) 41 Cal.4th 1068.) Applying these definitions, we conclude Measure Z contradicts — and thus is preempted by — section 3106.

As set forth above, section 3106, subdivision (b) provides that the state oil and gas supervisor "shall . . . supervise" oil production "so as to permit" well owners and operators to "utilize all methods and practices" that, "in the opinion of the supervisor, are suitable for th[e] purpose" of "increasing the ultimate recovery of underground hydrocarbons . . . in each proposed case." The subdivision also provides that, in order "[t]o further the elimination of waste by increasing the recovery of underground hydrocarbons," "it is . . . declared as a policy of this state that" all oil leases and contracts are deemed to give well operators the authority to use all methods and practices the supervisor has approved, including specifically, the water and steam injection methods that Measure Z bans. (§ 3106, subd. (b).)

By providing that certain oil production methods may *never* be used by anyone, anywhere, in the County, Measure Z nullifies — and therefore contradicts — section 3106's mandate that the state "shall" supervise oil operation in a way that permits well operators to "utilize *all* methods and practices" the supervisor has approved. In other words, whereas section 3106 directs *the supervisor* to make decisions about the use of *all* oil production methods — inclusive of those methods Measure Z identifies — Measure Z authorizes *the County* to make decisions regarding some of those methods. Thus, were any oil producer to ask the state to decide whether those methods are authorized for use in the County, Measure Z, by banning those methods, has made that decision for — and in lieu of — the supervisor; it

has, in all cases, usurped the supervisor's statutorily granted authority to decide whether those methods are "suitable . . . in each proposed case." (§ 3106, subd. (b).)

As we stated in *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 17, a conflict is "a genuine one" where it is "unresolvable short of choosing between one enactment and the other." Here, a "genuine" conflict exists in the sense that the state and local laws provide conflicting instructions as to which entity has the authority to decide what production methods are permissible. We agree with the Court of Appeal's statement that "[i]t is not possible for the authority to permit these methods and practices to rest in the state's hands if the local ordinance forbids these methods and practices. As the two laws conflict with respect to who controls the use of these methods and practices, the local ordinance must yield to the supreme state law." (*Chevron, supra*, 70 Cal.App.5th at p. 171.) Because Measure Z "cannot be reconciled with state law" (*O'Connell v. City of Stockton, supra*, 41 Cal.4th at p. 1068) and is "inimical thereto" (*Sherwin-Williams, supra*, 4 Cal.4th at p. 898), it is preempted.

In urging us to conclude otherwise, PMC argues that several statutes that allow local control over some aspects of oil extraction reflect the Legislature's intent not to preempt local oil-related ordinances. PMC cites to our decision in *Big Creek Lumber* that " '[p]reemption by implication of legislative intent may not be found when the Legislature has expressed its intent to permit local regulations' " or " 'when the statutory scheme recognizes local regulations.' " (*Big Creek Lumber, supra*, 38 Cal.4th at p. 1157.)

PMC's argument fails because the statutes it cites only address the authority of local entities to determine *whether and where* oil production may occur within their boundaries based on local zoning laws; they do not address *oil production methods* at existing wells. For example, PMC cites section 3203.5, subdivision (a), which provides that "[CalGEM] shall require a copy of the local land use authorization that supports the installation of a well at the time an operator submits the notice of intention for the well . . . ." PMC also cites section 3012, which references a city's ability to "prohibit[] . . . [oil] wells." And PMC cites recently enacted section 3289, subdivision (b), which limits oil and gas exploration in certain "health protection zones" such as in residential areas but "does not prohibit . . . more stringent regulations, limits, or prohibitions on oil and gas development" by localities. Although these statutes may be potentially relevant to whether the Legislature intended to preempt ordinances that restrict the *location* at which oil may be extracted — a proper concern of zoning measures — they do not impact our analysis of the preemption question before us, which concerns a local ordinance that regulates certain *methods and practices* of oil extraction in areas where oil production has already been approved and is ongoing.[6]

---

[6] PMC also cites to section 3690, which provides: "This chapter [(chapter 3.5)] shall not be deemed a preemption by the state of any existing right of cities and counties to enact and enforce laws and regulations regulating the conduct and location of oil production activities, including, but not limited to, zoning, fire prevention, public safety, nuisance, appearance, noise, fencing, hours of operation, abandonment, and inspection." Chapter 3.5, however, is limited to "unit operations" and does not include section 3106. Similarly, PMC's

*(Footnote continued on next page.)*

PMC seeks to evade this problem by asserting that Measure Z does in fact "regulate[] *where and whether* certain operations may occur." Having described Measure Z as placing *locational* restrictions, PMC argues that our decision in *Big Creek Lumber* precludes a finding of implied preemption here.

A review of *Big Creek Lumber* reveals that it is factually distinct from the issues posed by Measure Z, and is therefore inapplicable. In *Big Creek Lumber*, we addressed two local land use ordinances that restricted timber harvesting and certain types of timber operations to specified zone districts and parcels. (*Big Creek Lumber*, *supra*, 38 Cal.4th at pp. 1145, 1162.) We held that these locational ordinances, which regulated only *where* commercial logging could occur, were not expressly preempted by a state law that regulated — and prohibited counties from also regulating — "the conduct of timber operations" because "an ordinance that avoids speaking to *how* timber operations may be conducted and addresses only *where* they may take place falls short of being 'a clear attempt to regulate the conduct' thereof." (*Id.* at pp. 1158, 1152–1153.)

Unlike in *Big Creek Lumber*, where the state and local laws addressed different subjects — "how" (state) and "where"

reliance on sections 3160 and 3161 is misplaced because the statutes relate to well stimulation, which is also not at issue here. At most, section 3160, which provides that CalGEM and other agencies must comply with existing environmental laws, and section 3161, which provides that a local entity may conduct its own environmental review (in addition to CalGEM's required environmental review), may reflect a legislative intent to carve out well stimulation as an area of shared regulatory authority. There is no similar language relating to "methods and practices" generally (§ 3106, subd. (b)) that would preclude a finding of implied preemption as to Measure Z's prohibitions.

(local) timber operations could take place — here, both section 3106 and Measure Z address the same topic of *how* oil producers and well operators should be permitted to extract oil. By its plain language, LU-1.22 is a ban on oil production methods — i.e., activities in support of "oil and gas wastewater injection or oil and gas wastewater impoundment"— not a *locational* restriction. Regarding LU-1.23, its ban on the drilling of all new wells, at first glance, appears to regulate *where* oil production can take place, i.e., nowhere in the County. But the language of LU-1.23 broadly defines "oil and gas wells" to include any type of well "drilled for the purpose of . . . aiding in the recovery of[] oil and gas." Thus, the language of LU-1.23 sweeps broadly and extends its ban to any oil production method that requires the drilling of new wells — such as wastewater and steam injection wells — in order to continue extracting oil from existing oil fields. In addition, Measure Z describes water injection and impoundment and the drilling of new oil wells as "[r]isky [o]il [o]perations," i.e., methods of oil production that should be banned. LU-1.23 therefore constitutes a ban on certain oil production methods in existing oil fields. Accordingly, we reject PMC's attempt to characterize Measure Z as a zoning ordinance that restricts the location of oil production. Because Measure Z regulates the same conduct that section 3106 addresses — i.e., oil production methods — our decision in *Big Creek Lumber* is inapposite.

Other cases on which PMC relies are inapposite for similar reasons. (E.g., *Higgins v. City of Santa Monica* (1964) 62 Cal.2d 24, 28–29; *Beverly Oil Co. City of Los Angeles* (1953) 40 Cal.2d 552, 558; *Pacific Palisades Assoc. v. City of Huntington Beach* (1925) 196 Cal.211, 216–217.) Other than *Higgins* — which discussed whether the state occupies the field of oil production

on tidelands — none of these decisions discusses state preemption principles. Instead, they address a local entity's police power and authority to restrict or ban oil production based on reasonable zoning restrictions. Here, we do not decide, or express any opinion on, whether local entities may restrict or ban oil production within their boundaries based on proper zoning restrictions. As the Court of Appeal stated, "Our narrow holding does not in any respect call into question the well-recognized authority of local entities to regulate the *location* of oil drilling operations, a matter not addressed by section 3106 or Measure Z." (*Chevron*, *supra*, 70 Cal.App.5th at p. 159, italics added.) "Nothing in this opinion should be construed to cast any doubt on the validity of local regulations requiring permits for oil drilling operations or restricting oil drilling operations to particular zoning districts" because "[t]his case involves no such regulations." (*Id.* at p. 172, fn. 16.) Thus, we find no support for PMC's argument in this line of cases, which deals with locational restrictions or prohibitions on oil production based on zoning laws.

Next, PMC argues that language from *City of Riverside v. Inland Empire Patients Health & Wellness Center, Inc.* (2013) 56 Cal.4th 729, 743 (*City of Riverside*) supports a nonpreemption finding. PMC's reliance on *City of Riverside* is also misplaced. In that case, we held that a local regulation banning medical marijuana dispensaries within city limits did not contradict the Compassionate Use Act (CUA; Health & Saf. Code, § 11362.5) and the Medical Marijuana Program (MMP; *id.*, § 11362.7 et seq.). (*City of Riverside*, at p. 742.) As PMC notes, we stated in our opinion that a local ordinance does not contradict state law "unless the ordinance . . . prohibits what the state enactment demands." (*City of Riverside*, at p. 743; *T-*

*Mobile West LLC v. City and County of San Francisco* (2019) 6 Cal.5th 1107, 1121 [quoting the same language and concluding there was no contradiction preemption because it was reasonably possible to comply with both state and local law where the state statute did not address the same subject matter addressed by the local ordinance].)  PMC asserts there is no contradiction preemption here because the oil production methods Measure Z prohibits are methods that the supervisor, pursuant to section 3106, may *permit or authorize.*

However, as Justice Liu observed in his concurring opinion in *City of Riverside*, the demands/prohibits language "should not be misunderstood to improperly limit the scope of the preemption inquiry." (*City of Riverside, supra*, 56 Cal.4th at p. 763 (conc. opn. of Liu, J.).)  As Justice Liu also noted in his concurring opinion, other statements in our *City of Riverside* opinion "make[] clear" that "state law may preempt local law when local law prohibits not only what a state statute 'demands' but also what the statute permits or authorizes." (*Ibid.*, italics added, citing maj. opn.'s discussion of *Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 293 and *Great Western Shows v. County of Los Angeles* (2002) 27 Cal.4th 853, 867–868.)  For example, in *City of Riverside*, we acknowledged prior case law stating that if a local ordinance "attempted to prohibit conduct proscribed or *permitted* by state law[,] either explicitly or implicitly, it would be preempted.' " (*City of Riverside*, at p. 758, quoting *Cohen*, at p. 293, italics added.)  In *Great Western Shows*, at page 866, we cited with approval *Northern Cal. Psychiatric Society v. City of Berkeley* (1986) 178 Cal.App.3d 104, 106 (*Northern Cal. Psychiatric Society*), which held that a local ban on electroconvulsive therapy contradicted a state law that permits it "in cases which meet . . . stringent regulations"

and ensures mentally ill persons the " 'right to treatment services which promote the potential of the person to function independently.' "

Of significance to our analysis here, in *City of Riverside*, we reiterated that a state law does not " 'authorize' activities, to the exclusion of local bans, simply by exempting those activities from otherwise applicable state prohibitions." (*City of Riverside*, *supra*, 56 Cal.4th at p. 758.) We held that the CUA and MMP did not " 'authorize' activities . . . to the exclusion of local bans" because they were "limited and circumscribed" state laws that "merely declare that" certain medical marijuana activities are no longer subject to criminal and nuisance sanctions. (*City of Riverside*, at pp. 758, 738; *id*. at p. 760.) They "create[] no comprehensive scheme for the protection or promotion of facilities that dispense medical marijuana" and contain no implied limitations on a local entity's authority to restrict or prohibit marijuana-related activities within their boundaries. (*Id*. at p. 760.)

In contrast, section 3106 implicitly limits a local entity's authority by expressly providing that the state supervisor shall approve all production methods that are, "in the opinion of the supervisor," "suitable for th[e] purpose" "of increasing the ultimate recovery of underground hydrocarbons." (§ 3106, subd. (b).) By banning some oil production methods altogether, Measure Z takes those methods off the table and nullifies the supervisor's express, statutorily-conferred authority to decide what oil production methods are suitable in each case. (See *Northern Cal. Psychiatric Society*, *supra*, 178 Cal.App.3d at p. 106 [contradiction preemption where the state law authorized treatment in appropriate cases and the local ordinance

completely banned it].) Accordingly, the mandate/prohibits language from *City or Riverside* does not preclude a finding of implied preemption here.

Last, PMC relies on our statement in *City of Riverside* that "no inimical conflict will be found where it is reasonably possible to comply with both the state and local laws." (*City of Riverside*, *supra*, 56 Cal.4th at p. 743.) Seizing upon this language, PMC asserts there is no contradiction preemption here because well operators can comply with both Measure Z and section 3106 by not using the oil production methods Measure Z bans, or by ceasing to produce oil in the County altogether.[7] In essence, PMC argues that the theoretical possibility of compliance with both state and local law is sufficient to overcome preemption.

PMC's argument fails because, as noted above, compliance with both laws must be "*reasonably* possible." (*City of Riverside*, *supra*, 56 Cal.4th at p. 743, italics added.) Here, we cannot say it is "reasonably possible" for well operators "to comply with both the state and local laws" (*ibid.*) by requiring them to curb their conduct in a way that conforms to a local ban, without regard to what the state law permits. Carried to its logical extension, PMC's argument would mean that a local law that contradicts state law would never be preempted, because in almost every case, it is theoretically possible for a party to comply with state and local laws that contradict each other, simply by not

---

[7] As noted, the trial court found that oil production would cease in five years or less were oil producers in the County banned from using the methods specified in Measure Z. PMC denies that Measure Z is "about ending oil and gas operations in the [C]ounty," but PMC does not identify any methods other than the ones Measure Z bans that oil producers in the County would be able to use to continue producing oil in the County.

engaging in the conduct prohibited by local law.[8]  Our statement in *City of Riverside* does not narrow the scope of contradiction preemption in this manner.

Accordingly, we conclude Measure Z contradicts, and therefore conflicts with and is preempted by, section 3106.[9]

---

[8]    Take, for example, our conclusion in *Ex Parte Daniels* (1920) 183 Cal. 636, 647–648, that contradiction preemption applies to a local ordinance setting the maximum speed limit lower than that set by state law.  (See *O'Connell v. City of Stockton*, *supra*, 41 Cal.4th at p. 1068 [characterizing *Ex Parte Daniels* as a " ' "contradiction" ' " preemption case].)  It may be *possible* for a local resident to comply with both laws by driving at or below the lower, local speed limit, or by not driving at all, but this does not mean that compliance with both laws is "reasonably possible" (*City of Riverside*, *supra*, 56 Cal.4th at p. 758) such that the local law is not preempted.

[9]    PMC argues a strong presumption against preemption applies because Measure Z is a "land use ordinance."  Regardless of whether Measure Z qualifies as a "land use ordinance," we conclude that any presumption that might apply (see *Big Creek Lumbe*r, *supra*, 38 Cal.4th at p. 1151) is amply rebutted by the fact that the measure clearly contradicts section 3106.

Given our finding of contradiction preemption, we need not address whether the doctrine of field preemption also applies, which would require us to define a "field" and determine whether state law, in light of its purpose and scope, has "fully occupied" that field. (*Sherwin-William*s, *supra*, 4 Cal.4th at p. 898 [field preemption considerations include whether the subject matter is " 'exclusively a matter of state concern,' " indicates a " 'paramount state concern,' " or " 'is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the' locality"].)  Nor need we address the parties' conflicting views on whether and how to apply the federal "obstacle preemption" doctrine.

**DISPOSITION**

We affirm the Court of Appeal's judgment.

**JENKINS, J.**

**We Concur:**
**GUERRERO, C. J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**EVANS, J.**
**RAPHAEL, J.**[*]

---

[*]     Associate Justice of the Court of Appeal, Fourth Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Chevron U.S.A. Inc. v. County of Monterey

_____

<u>Procedural Posture</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 70 Cal.App.5th 153
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S271869
**Date Filed:** August 3, 2023

_____

**Court:**  Superior
**County:**  Monterey
**Judge:**  Thomas W. Wills

_____

**Counsel:**

Robins Kaplan, Michael Geibelson, Bernice Conn, Lucas A. Messenger; Environmental Law Clinic  at Stanford Law School, Deborah A. Sivas, Alicia E. Thesing; Center for Biological Diversity, Hollin N. Kretzmann; Shute, Mihaly & Weinberger, Catherine Engberg, Kevin P. Bundy and Aaron M. Stanton for Interveners and Appellants.

Katherine S. Hoff, Shana D.G. Lazerow, Alison Hahm; Julia K. Forgie; M. Benjamin Eichenberg; Paulina Nicole Torres and Ingrid M. Brostrom for Communities for a Better Environment, Natural Resources Defense Council, San Francisco Baykeeper and Center on Race, Poverty & the Environment as Amici Curiae on behalf of Interveners and Appellants.

James R. Williams, County Counsel (Santa Clara), and Elizabeth Vissers, Deputy County Counsel, for County of Santa Clara as Amicus Curiae on behalf of Interveners and Appellants.

Noah Garrison for Former State Senator Fran Pavley as Amicus Curiae on behalf of Interveners and Appellants.

Frank G. Wells Environmental Law Clinic, Sean B. Hecht, Benjamin Avi Harris and Gabriel F. Greif for League of California Cities, California State Association of Counties and County of Los Angeles as Amici Curiae on behalf of Interveners and Appellants.

Alston & Bird, Jeffrey D. Dintzer, Matthew Wickersham; Gibson Dunn & Crutcher, Theodore J. Boutrous, William E. Thomson, Dione Garlick; Ragghianti Freitas and Todd Welden Smith for Plaintiff and Respondent Chevron U.S.A., Inc.

Hanson Bridgett, Andrew A. Bassak, Christopher A. Rheinheimer, Gary A. Watt, Patrick Burns; Manatt, Phelps & Phillips, Michael M. Berger and Benjamin Shatz for Plaintiff and Respondent Aera Energy LLC.

O'Melveny & Myers, Matthew Thomas Kline, Heather A. Welles and Barton H. Thompson for Plaintiff and Respondent California Resources Corporation.

Clifford & Brown and Donald C. Oldaker for Plaintiff and Respondent Eagle Petroleum, LLC.

JRG Attorneys at Law, Johnson, Rovella, Retterer, Rosenthal & Gilles and Jason S. Retterer for Plaintiffs and Respondents Trio Petroleum, LLC, Sunset Exploration Inc., Monroe Swell Prospect, J.V., and Bradley Minderals, Inc.

Hanna and Morton, Edward S. Renwick; and Jacqueline M. Zischke for Plaintiff and Respondent National Association of Royalty Owners— California, Inc.

Manatt, Phelps & Phillips and Michael M. Berger for Western States Petroleum Association and California Independent Petroleum Association as Amici Curiae on behalf of Plaintiffs and Respondents.

Munger, Tolles & Olson, Benjamin J. Horwich and Dila Mignouna for Chamber of Commerce of the United States of America, California Chamber of Commerce, Central Valley Business Federation and Los Angeles County Business Federation as Amici Curiae on behalf of Plaintiffs and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kevin P. Bundy
Shute, Mihaly & Weinberger LLP
396 Hayes Street
San Francisco, CA 94102
(415) 552-7272

Theodore J. Boutrous
Gibson Dunn & Crutcher, LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7804